570 A.2d 522

In re P.A.B.; M.E.B.; M.A.B.

**Appeal of G.B. and P.B., Appellants.**

Superior Court of Pennsylvania.

Argued Sept. 28, 1989.

Filed Jan. 24, 1990.

Reargument Denied March 8, 1990.

Ralph D. Oyler, Gettysburg, for appellants.

Chester G. Schultz, Gettysburg, for Children & Youth Services, participating party.

Before CIRILLO, President Judge, and BECK and JOHNSON, JJ.

JOHNSON, Judge:

This is an appeal from an order terminating the parental rights of appellants father G.B. and mother P.B. (Parents). We are asked to apply the Grounds for Involuntary Termination provision of the Adoption Act—specifically, 23 Pa. C.S. § 2511(a)(5)—to loving parents who have an irremediable incapacity. In doing so we must examine how the parental incapacity impacts upon both the physical and emotional dimensions to the children's needs and welfare. In this case we must take into account the existing parent-child bond, an undisputed fact of record. We conclude that a proper application of the statute mandates against termination; maintaining the natural parent-child relationship best serves the children's needs and welfare. Therefore we reverse the order terminating the Parents' rights.

The Parents are married and have three children. P.A.B. (Patrick), born September 22, 1977 is diagnosed as moderately mentally retarded; M.E.B. (Mark), born April 18, 1980 suffers from developmental disabilities; and M.A.B. (Melissa), born May 1, 1982 has heart disease that requires medication. Although no evidence was presented at the hearing on the subject, counsel for the Parents as well as

for Children and Youth Services (CYS) aver that the Parents are mentally incapacitated. The trial court incorporated this averment into its findings: "The parents are of limited intelligence, limited parenting skills and limited ability to understand the obligations and duties of parenthood." Finding of Fact Number 4.

The Parents needed assistance in caring for their children, which was provided by various social service agencies. However, in March of 1984, CYS decided that these efforts were insufficient, and Patrick and Melissa were removed from the Parents' custody, were adjudicated dependent and were placed in foster homes. In July of 1983 Mark was removed and was adjudicated dependent, at which time he was placed in foster care. He was returned to the custody of his parents in October of 1983, but CYS resumed custody in March of 1984. Mark is now in a specialized group home.

Since the childrens' removal, the Parents have put forth considerable effort to maintain association with the children, including meeting a bi-monthly visitation schedule despite the hardships attendant to living in a rural area without private transportation. According to CYS, these visits are conducted outside the Parents' home due to the need to supervise the visits; CYS claims that the Parents cannot control the children without assistance. In addition, both parents have been attending parenting classes and have been striving to do their best to understand parental duties and how to perform them.

On February 17, 1988 CYS filed separate petitions to terminate the Parents' parental rights in each child. The petitions did not designate a particular section or sections of the Adoption Act under which termination would be appropriate. However, the petitions included language from 23 Pa.C.S. §§ 2511(a)(2) and (a)(5). These sections provide:

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal *cannot or will not be remedied by the parent.*

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, *the parent cannot or will not remedy* those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511 (emphasis added).

Counsel were appointed to represent the children as well as to represent the Parents in the termination proceedings. Following hearings, which took place on April 19, 21 and 22, 1988, the court entered Findings of Fact. Along with these findings of fact the court raised sua sponte whether the statutory language of section 2511 may be applied to the Parents, who have no control over their deficiencies, or whether policy considerations and/or constitutional considerations require a different result. The court asked counsel to brief and argue this constitutional question, which they did. Subsequently, the court entered Conclusions of Law and a Decree Nisi on July 25, 1988 finding that the requisites of Pa.C.S. § 2511(a)(5) had been met. The court also concluded, based upon the supreme court's decision in *In re William L.*, 477 Pa. 322, 383 A.2d 1228 (1978), *cert. denied*

*sub nom Beatty v. Lycoming County Children's Services,* 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978), that the statutory language on its face does not trigger an unconstitutional termination of rights.

The Parents filed exceptions in which they challenged the trial court's factual findings as well as whether CYS demonstrated by clear and convincing evidence that the elements necessary to terminate parental rights were present. On October 28, 1988 the Parents filed supplemental exceptions, in which they disputed specific findings of fact. On April 10, 1989, the court dismissed the exceptions and rendered absolute the decree terminating the Parents' parental rights.

The Parents now appeal, raising the following issues:

1. Does 23 Pa.C.S. § 2511(a)(5) violate the equal protection clause of the 14th Amendment to the United States Constitution?

2. Has Pennsylvania chosen the least restrictive means of promoting its interest in protecting minor children?

3. Does 23 Pa.C.S. § 2511(a)(5) violate the due process clause of the 14th Amendment to the United States Constitution?

4. Does public policy mediate against the termination of parental rights in the absence of a finding of fault?

5. Was the evidence adduced at the hearing in the case sub judice sufficient to support the termination of the Parents' parental rights?

In reviewing an order involuntarily terminating parental rights:

[T]he scope of appellate review is limited to the determination of whether the decree of termination is supported by competent evidence. (citation omitted). If the decree is adequately supported by competent evidence, and the chancellor's findings are not predicated upon capricious disbelief of competent and credible evidence, the adjudication of the Orphan's Court terminating parental rights will not be disturbed on appeal. (citation omitted). It is

> established that, in a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing evidence" the existence of grounds for doing so. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (citation omitted).

*In re Adoption of J.J.*, 511 Pa. 590, 593–594, 515 A.2d 883, 885–886 (1986), *quoting Matter of Adoption of G.T.M.*, 506 Pa. 44, 46, 483 A.2d 1355, 1356 (1984). Unless the Orphans' Court abused its discretion or committed an error of law, its findings are entitled to the same weight given a jury verdict. *In re Adoption of J.J.*, 511 Pa. at 594, 515 A.2d at 886.

With this standard in mind we will address the Parents' appeal. The Parents mount a facial constitutional challenge to 23 Pa.C.S. § 2511(a)(5). The Parents argue that the statute denies them due process by allowing termination when the unsatisfactory conditions are not a result of any fault on their part. They also submit that they are denied equal protection because the statute impermissibly treats the class of mentally incapacitated people such as themselves differently from others. The substance of their challenge is that mentally impaired parents, by nature, are not capable of improving and so are not capable of remedying adverse conditions resulting from their impairment. Thus, once children have been removed from the home for at least six months, they argue that 2511(a)(5) operates automatically to terminate parental rights of mentally impaired parents: the conditions that led to the removal will always continue to exist, and no amount of agency assistance will remedy the conditions at all, let alone within a reasonable period of time.

■ The crux of this case is whether the status of having a permanent mental disability is alone sufficient to satisfy 2511(a)(5). This is primarily an issue of statutory interpretation. When a case raises both constitutional and nonconstitutional issues, and if the case can properly be decided on nonconstitutional grounds, we should not reach the constitu-

tional issue. *Ballou v. State Ethics Commission,* 496 Pa. 127, 436 A.2d 186 (1981). Further, in ascertaining legislative intent, we are to presume that the General Assembly, in creating legislation, does not intend to violate either the state or federal constitutions. 1 Pa.C.S. § 1922(3). Thus, we do not address the equal protection issue raised here; a resolution of how the statute is to be applied properly resolves the case.

■ A decision that termination would best serve the needs and welfare of the children is required by 2511(a)(5). This determination is not a mere formality flowing from the existence of the preceding four elements enumerated in the statute, 1) removal from parental care for at least six months, 2) continued existence of conditions that led to the removal, 3) a finding that the parents cannot or will not remedy these conditions within a reasonable period of time, and 4) a finding that services available are not likely to bring about the remedy of the conditions. In this case the court found that the status of mental incapacity was sufficient to satisfy section 2511(a)(5). The court found that the children had been placed outside the home for at least six months and that, because the parents were mentally impaired, the conditions leading to the removal would not change, regardless of assistance available.

Based solely upon these determinations, the court concluded that "[t]ermination of parental rights will best serve the needs and welfare of the child." Completed Adjudication and Decree Absolute, April 10, 1989. The trial court's opinion implied that satisfaction of these four requisites required the conclusion that termination would best serve the childrens' needs and welfare. The trial court did not consider needs and welfare as a discrete consideration. Therefore, the court committed an error of law in misapplying the statute.

If the language of the statute creates ambiguity in how it is to be applied to mentally impaired parents, then it is up to the legislature to clarify its application. Our responsibility as an appellate court is to consider the consequences, both

legal and practical, of our interpretation. 1 Pa.C.S. § 1921(c)(6). Our underlying concern as we consider this case should be whether an application of 2511(a)(5) that permits termination of the rights of parents who love their children simply because the parents are retarded is consistent with the legislative intent. We conclude that the language of the statute does not require this interpretation. Moreover, in this case, the facts do not warrant this result.

Needs and welfare denotes certain minimum requirements to which all children are entitled, including adequate housing, clothing, food and love. *In re Coast,* 385 Pa.Super. 450, 466–67, 561 A.2d 762, 770 (1989) (en banc). Thus, needs and welfare has both a tangible dimension, food, clothing and shelter, and an intangible dimension, parental love. The bond with parents is unique and irreplaceable, making preservation of family ties prima facie in the best interests of the child. Conversely, where preserving family unity in form when no parent-child relationship exists will in fact cast the child into an unstable and unhappy environment, a consideration of the child's needs and welfare may warrant termination. *See William L., In re Angry,* 361 Pa.Super. 180, 522 A.2d 73 (1987). If, as here, ties with natural parents are present and are an active force in the child's life, then needs and welfare becomes a concept that argues against termination rather than fosters it. *See Coast, supra,* (Beck, J. concurring).

It follows that in a termination proceeding under 2511(a)(5), a court, in considering what situation would best serve the child's needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial. Hence, the party seeking termination, the one that bears the burden, *Santosky v. Kramer, supra,* must prove that the family ties either do not exist or no longer help but rather hinder the children. *See In re Angry,* 361 Pa.Super. at 182–85, 522 A.2d at 75. That the child has already been removed from the home, as is always the case in a termi-

nation proceeding instituted under 2511(a)(5), does not in itself mean that a beneficial parent-child bond does not exist. This fact alone cannot be dispositive of whether termination best serves the child's needs and welfare. Thus, to apply the statute correctly, there must be an inquiry into the status of the bond, regardless of whether the parents have a physical or mental incapacity.

Our supreme court resolved the due process issue in *In re William L., supra,* where a retarded and pregnant mother voluntarily gave up her three older sons for placement and where CYS sought termination. The court held that parental incapacity due to retardation is a permissible constitutional basis upon which to base termination of incapacitated parents' rights. Significantly, however, the court's ensuing analysis demonstrated that a necessary underpinning to this holding is a proper consideration of all factors bearing upon the child's needs and welfare in light of the facts of record.

First, *William L.* establishes that while the state can generally not enter into the private realm of family life and that parental rights must be accorded significant protection, the state as *parens patriae* has an affirmative duty to protect minor children. Thus, the restraint on state interference in family matters does not reach so far as to compel the courts to protect parental rights at the expense of ignoring the rights and needs of children. *William L.,* 477 Pa. at 337, 383 A.2d at 1236. Where the parents do not, for whatever reason, provide for the needs of their children:

[t]he interest of the parent in keeping the child conflicts with the interest of the child in its essential physical and emotional needs and the Legislature has constitutionally mandated that the interests of the weaker party, the child, should prevail.

*William L.,* 477 Pa. at 339, 383 A.2d at 1236. The *William L.* court rejected appellant's assumption that the purpose of the termination statute was to punish an ineffective or negligent parent and that therefore a finding of parental fault was constitutionally necessary before termination. Rather, the court pointed out, inquiry should center upon

the welfare of the child rather than the fault of the parent. 23 Pa.C.S. § 2511, Comment—1970.

Next, having decided that the statute was facially constitutional, the *William L.* court took great care in applying the statute to the facts. The court considered whether the retardation prevented the mother from properly caring for her sons and by reviewing the evidence concluded that it did. However, it did not accept this conclusion as alone sufficient to meet the terms of the statute. The court found it necessary to carry its analysis one step further to discover whether, as a result of the parent's inability to provide care:

> [T]he parent-child relationship is substantially "weakened by long separation" and cannot be re-established.

*William L.,* 477 Pa. at 350, 383 A.2d at 1242. Recognizing that the parent-child relationship is necessary to the child, and that an existing parent-child relationship with a natural parent should not be disturbed, the court determined that an irredeemable breakdown of this relationship would justify termination so that the child could form a new bond with an adoptive parent; the child should not be left in limbo with no parental bond at all:

> In such circumstances, the issue is not whether the state should intrude to disrupt an on-going family relationship, but whether the state should seek to preserve in law a relationship which no longer exists in fact, with the result that the child is consigned indefinitely to the limbo of foster care or the impersonal care of institutions.

*William L.,* 477 Pa. at 348–349, 383 A.2d at 1241.

The court concluded that the record supported the finding that a parental relationship no longer existed and that whatever relationship had been had greatly deteriorated. All three sons testified that they did not want to live with their mother. Each child was in a pre-adoptive home. Given that there was no relationship with the natural mother, the *William L.* court affirmed the trial court's conclusion that the children required a parental bond and that termination would further this goal by paving the way for

adoption. Similarly, in *In re D.L.R.*, 495 Pa. 55, 432 A.2d 196 (1981), the supreme court, relying upon *William L.*, summarily affirmed termination of a retarded mother's parental rights giving as the reason that the record supported the trial court's determination. Even if the issue before the court was, as was expressed in the dissent, whether mental incapacity alone may justify a termination, the court's reliance upon *William L.* suggests that the supreme court affirmed a determination resulting from a properly thorough analysis and not a conclusion that the mere existence of mental incapacity is sufficient to terminate parental rights.

The present case is distinguishable from *William L.* upon the facts as well as in the way that the court applied the statute. In the present case the trial court accepted the attorneys' stipulations that the Parents were retarded. Assuming this, the testimony given by social workers regarding the Parents' inability to care for their children without aid is irrelevant to the nature and strength of the parent-child bonds. However, the record does establish that a parental bond exists, and the trial court itself so concluded. The court found that "The parents have consistently displayed a loving and caring attitude toward the children and have inquired as to their welfare, taken presents and have consistently exhibited the care and love of parents." Findings of Fact, Number 11.

This finding was supported by uncontested evidence. The Parents raised the three children for six, four and two years respectively, until CYS found it necessary to remove them from the home. Since removal, the Parents have maintained a visitation schedule and have participated in parenting classes. While CYS presented extensive testimony that the Parents had difficulty with such functions as shopping, dressing the children, administering medication and controlling the childrens' behavior, none of this testimony negated the existence and quality of the emotional parent-child bond. Several of the social workers testified that the Parents obviously loved their children.

On the other hand, in *William L.*, the court had before it expert testimony of a psychiatric examination as well as testimony that even visitation had an adverse effect upon the child. None of this was present in the record in the Parents' case. Significantly, there is not one shred of evidence that the Parents' presence had any detrimental effect upon the children. The worst that was testified to was that the children did not obey the Parents during visits. This could be expected where the parents see their children only once every two weeks. We must also remember that these children have special needs to which any parent would have difficulty ministering. When analyzing a parent's performance, we measure the performance in light of what we would expect an individual to do in circumstances similar to those in which the parent finds himself. *In re Adoption of B.D.S.*, 494 Pa. 171, 431 A.2d 203 (1981).

Cases which at first appear to decide the role of a mental handicap of parents in termination proceedings are, upon closer inspection, inapposite. In *In Adoption of J.J.*, the appellant father was schizophrenic. While the court held that a mental impairment resulting in incapacity may be grounds for termination, the court based its decision upon additional facts, that the father had originally denied paternity, had taken little interest in visiting the child, was unemployed and used drugs. We also affirmed termination of parental rights in *In re Angry, supra*, where the child was born in a mental ward from which the father tried to kidnap him, and CYS gained immediate custody. In neither of these cases was there an existing parent-child bond.

In contrast, termination would be detrimental to the present children's needs and welfare not only because it would sever an important existing parent-child bond, but also because nothing will take the place of this bond. Generally, CYS attempts to plan toward stabilization of a child's situation, and, toward this end, adoption may best serve a child's needs and welfare in a given case. *See In re Damon B.*, 338 Pa.Super. 597, 488 A.2d 53 (1985). Termination of parental rights is usually a step toward adoption,

although an adoption need not be imminent before an agency may bring a termination petition. *In re Burns*, 474 Pa. 615, 379 A.2d 535 (1977). In this case, the record only suggests in one statement in testimony that there *may* be a possibility that Melissa's foster parents will adopt her. No alternative permanent situations are on the horizon for Patrick and Mark. Thus, termination would cut off a natural and beneficial parent-child bond and would not facilitate putting another in its place. Termination would stabilize nothing.

We conclude that nothing in the record in this case indicates that a change in the children's situations would serve their needs and welfare. A determination that the Parents' incapacity results in an inability to care for the children and that the condition cannot improve over time is alone insufficient to warrant termination under 2511(a)(5). In considering how termination affects the children's needs and welfare, a court must consider the role of the parental bond in the children's lives. Here, significantly, the court acknowledged but did not consider the children's relationship with the Parents.

No precedent prevents the children from living outside the parental home while at the same time maintaining a relationship with the Parents, and no one advocates returning the children to the Parents' custody. The children's family would be extended by a disposition of non-termination, and their experience enriched. The children benefit from the relationship with the Parents that they now have. To terminate the Parents' rights would sever the relationship and injure the children. From the undisputed facts of record and from the trial court's own findings of fact, we apply § 2511(a)(5) and conclude that maintaining the status quo best serves the children's needs and welfare.

The order terminating the Parents' parental rights is reversed.