584 A.2d 1014

**In re E.M., a/k/a E.W.C. and L.M., a/k/a L.C., Minors.**

**Appeal of ELIZABETH M.**

Superior Court of Pennsylvania.

Argued Aug. 21, 1990.

Filed Jan. 10, 1991.

**5.** The same rule appears in Restatement 2d (Torts) § 673(d).

Raymond N. Sanchas, Pittsburgh, for appellant.

Carla S. Hobson, Pittsburgh, for Children and Youth Services, participating party.

Before POPOVICH, JOHNSON and HESTER, JJ.

POPOVICH, Judge:

This case requires us to review the propriety of a decree from the Orphans' Court, Allegheny County, ordering the involuntary termination of parental rights under Pennsylvania's Adoption Act, 23 Pa.C.S.A. § 2511, where a natural parent is found to lack the capacity to raise children. See, e.g., *In re: Adoption of B.J.R.*, 397 Pa.Super. 11, 579 A.2d 906 (1990); *In re G.D.G.*, 392 Pa.Super. 575, 573 A.2d 612 (1990); *In re P.A.B.*, 391 Pa.Super. 79, 570 A.2d 522 (1990), *petition for allowance of appeal filed,* 81 M.Alloc.Dkt. 90 (April 7, 1990). We affirm.

Appellant, Elizabeth M., is the natural mother of Louis C. and Erick C., her eight and nine-year-old sons, respectively. The record discloses that Elizabeth suffers from mental retardation. Her son Erick suffers from both physical and mental retardation and is diagnosed "educable mentally retarded." Her younger son Louis is learning disabled. The children were first referred to the Allegheny County Children and Youth Services ("C & YS") in June, 1982. At this time it appeared that, apart from spousal violence, the family[1] was experiencing difficulty paying rent and purchasing food due to the father's expensive drinking habits. By March, 1983, the situation worsened to a degree where the family, evicted from their residence, was forced to seek temporary accommodations at the local Salvation Army. It is here where C & YS began to observe the mother's parenting deficiencies. The Salvation Army staff reported the mother as feeding her child water-diluted formula and spoiled milk from dirty bottles. The staff also noted that often she left soiled diapers in her room for days at a time. On December 12, 1983, the children were adjudicated dependant and placed with a foster family where presently they remain and from whom C & YS has received indication as to their intentions for adoption pending these proceedings. H.T. August 29, 1989 at 14.

■ The scope of appellate review from a decree of the Orphans' Court involuntarily terminating parental rights has been stated thusly:

If a decree is adequately supported by competent evidence, and the chancellor's findings are not predicated upon capricious disbelief of competent and credible evidence, the adjudication of the Orphans' Court terminating parental rights will not be disturbed on appeal. See *In Re: Adoption of M.M.*, 492 Pa. 457, 460, 424 A.2d 1280, 1282 (1981). It is established that, in a proceeding to involuntarily terminate parental rights, the burden of

1. The natural father, Louis C. Sr., had originally resided with Elizabeth and the children. Subsequently, he left the family and has since consented to the termination of his parental rights. Order of August 29, 1989.

proof is upon the party seeking termination to establish by 'clear and convincing' evidence that the existence of grounds for doing so. See *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In Re: T.R.,* 502 Pa. 165, 166, 465 A.2d 642, 642–43 (1983) [adopting the *Santosky* evidentiary standard in Pennsylvania].

*In the Matter of the Adoption of G.T.M.,* 506 Pa. 44, 46, 483 A.2d 1355, 1356 (1984). Broad, comprehensive review of the record below is the earmark of our review construct, however, "an appellate court will not reverse an order for termination of parental rights unless it is apparent that the trial court abused its discretion, committed an error of law, or lacked evidentiary support for its findings." *In re Adoption of James J.,* 332 Pa.Super. 486, 481 A.2d 892, 896 (1984). We leave to the chancellor all assessments of credibility, see *Adoption of S.H.,* 476 Pa. 608, 383 A.2d 529 (1978), yet subject to our independent assessment all inferences, deductions and conclusions derived from testimony credited by the judge below. See *Rinker Appeal,* 180 Pa.Super. 143, 150, 117 A.2d 780, 784 (1955) (determination before the court "depend[ed] upon inferences to be drawn from the evidence rather than the credibility of the witnesses"); *Matter of M.L.W.,* 307 Pa.Super. 29, 452 A.2d 1021 (1982).

Judge Mazur heard testimony from Pat Supancic, a C & YS caseworker assigned to the case in 1986. Ms. Supancic continued in a supervisory capacity up to and during these proceedings. Her testimony confirmed that Elizabeth, following removal, Elizabeth remained steadfast in her plea not to have the children adopted and at all times worked for their return to her custody. To this end, Ms. Supancic testified that Elizabeth was repeatedly advised of the requirements necessary for the return of her children. Ms. Supancic recalled: "it was always explained to [Elizabeth] what situations were needed for the children to [return]...." "She knew she would have to have a stabilized home, that she would need to be able to show that she can

handle both of the children independently...." [2]  H.T. August 29, 1989 at 10, 21.  Notably, within a span of approximately six years Elizabeth enrolled and earnestly participated in a variety of programs including:  Parents Anonymous, Begin Again, Esprit, Chartiers MH/MR Community Living Program, C & YS Homemaker and the Hill House Parent's Skill Program.  Elizabeth also had been receiving independent therapy up to the time of this disposition.

The record reveals a marked improvement in Elizabeth's standard of living subsequent to the removal of her children, to-wit:  she had, for the previous two years prior to commencement of the instant proceedings, been living with her paramour John Colvin and maintained a clean residence and stable living environment.  Unfortunately, the record also suggests that the programs proved to be of limited utility for a mother in Elizabeth's unique situation, *i.e.*, for mothers of limited mental acuity with "special needs" children already placed in foster care.[3]  Apparently, it was the exhaustion of viable service programs which served as the catalyst for C & YS opting for a plan of adoption in 1985.  H.T. August 29, 1989 at 26.  Judge Mazur credited this observation below, accepting that C & YS exhausted all possible alternatives available to a mentally retarded parent

**2.**  We note that Ms. Supancic also testified from C & YS business records kept in the ordinary course of business concerning events prior to her assignment to the case.

**3.**  The record is replete with references to the limited services available to persons in Elizabeth's unique situation.  Ms. Supancic noted on record a comment made by Avis Kotovsky from "Begin Again" that: "there really isn't a program out there that would help a mentally retarded mom raise children, especially children that were having problems of their own...."  H.T. August 29, 1989 at 11.  For instance, of marginal utility was the Chartiers MH/MR program.  The program involved partial hospitalization coupled with community living arrangements; unfortunately, at the time of Elizabeth's participation the children already had been placed in foster care.  H.T. August 29, 1989 at 9.  Likewise, in-home services proved to be of little help for Elizabeth whose children were removed from the home.

Kerrie Allenby, a Family & Community Services caseworker assigned to supervise visitation recalls Elizabeth "look[ing] for programs, and I would look for programs, also, and I was not finding anything appropriate ... [n]one of the programs were appropriate." H.T. August 29, 1989 at 52–53.

with "special needs" children. At the same time, the judge found no significant or noticeable improvement in Elizabeth's parenting skills. Opinion at 5.

The principal testimony offered to describe, firsthand, Elizabeth's present incapacity to parent was that of Kerrie Allenby, a Family & Community Services ("F & CS") caseworker assigned to the family from October, 1987, to May, 1989. Ms. Allenby's responsibilities included the supervision of foster care placement for "special needs" children, and the coordination and supervision of bi-monthly visitations between dependent children and their natural parents. According to Ms. Allenby, despite the unwavering consistency of Elizabeth's visits, and that the visitation sessions "[o]verall—they were interactive at times[,]" absent was the ability for Elizabeth independently to handle the children in a manner warranting unsupervised visitation. H.T. August 29, 1989 at 48–50. Ms. Allenby testified that visitation was supervised:

> [b]ecause of the children's behavior. They were very unruly and oppositional during the visits. It was not all the time, but at some time during the visits they were unruly and oppositional, and it was very difficult for Ms. M. to control them.
>
> I didn't supervise them completely. It was not total supervision. When they went out of the office, I did accompany them.
>
> .　　.　　.　　.　　.
>
> [Supervision was necessary] [b]ecause during the visits, the erratic behavior of the boys, you know—Louie would run, you know—he would just like leave the office or—
>
> There wasn't the authority to control him. He was a very active child. I just felt that it was safer overall to have supervision."

H.T. August 29, 1989 at 49. Admittedly, Elizabeth attempted to control her childrens' unruly behavior, as Ms. Allenby continued:

> "If they were fighting over a toy, she would remove the toy. When it got to issues like they were leaving the

visiting room, it was more difficult, because the options that she was aware of and the authority that she had over the children was minimal, so she was unable to control the children."

H.T. August 29, 1989 at 49.

Overall, while Ms. Allenby was assigned to the case, she was unable to detect—despite her efforts in this regard— any improvement in the quality of control exhibited by Elizabeth over the children.[4] H.T. August 29, 1989 at 55–56. At times attempts to incorporate her suggestions were made, but unfortunately the suggestions were not internalized by Elizabeth. Ms. Supancic, although without personal observation of the childrens' behavior, offered corroborating testimony from C & YS business records indicating that several other F & CS caseworkers presented similar assessments. That the confluence of this testimony persuaded Judge Mazur to find against an increase in Elizabeth's level of parental skill competency can be gleaned from his supportive citations to Ms. Allenby's testimony and the accompanying hearing transcripts which offer little more in substance or corroboration. Opinion at 2, 5.

Although not mentioned below, and before proceeding to our legal analysis, we feel constrained to acknowledge testimony from the record of a more positive flavor with respect to the natural mother—child relationship involved. Firstly, we note the distinct effort by Elizabeth to interact with the children at visitation, and how it appeared well-received by them. Ms. Allenby testified that Elizabeth "tried to interact with the children, and she would play games with them." "If they were doing an art project, she would always participate in that." H.T. August 29, 1989 at 51. From the childrens' perspective, Ms. Allenby noted their attitude toward visits:

4. Ms. Supancic corroborated, noting that Elizabeth would need more than support services, but rather a 24–hour companion who was good with children in order to care for Louis and Erick's special needs. H.T. August 29, 1989 at 42. We have not overlooked the potential support from her paramour Mr. Colvin who testified of his desire to assist in this capacity, yet without any legal commitment, we would be remiss in crediting his possible assistance.

I talked to them during the summer about the visits. Just in general I talked about how they were and everything, and at that time they said they were fine. They didn't want to go to visits, and at times they did. I talked to them again in the winter knowing that the adoption process was taking place ... and they both said they did like to visit.

H.T. August 29, 1989 at 58. Judge Mazur also heard testimony from Patricia Piercy, Ph.D., pertaining to the results of an interactional evaluation conducted between the children and their foster mother. Dr. Piercy recalled the children commenting on their parents. She noted in her report Erick's comment that he had "two mommies and daddies," but that he wanted to live with the mommy who was at the session and the daddy who was at work—referring to his foster father. Louis also referred to his foster parents as "mommy and daddy," and expressed that he had "another mommy and daddy" whom he referred to as Big Lou and Beth. At one point in the interview Louis indicated that he wanted to live with Beth and Big Lou, at another time he stated that he would like to live with Marilyn and Ernie—referring to his foster parents. Louis's ambivalence surfaced once again when asked his three favorite wishes, noting that one was to live with Beth and Big Lou, another was to live with Marilyn and Ernie, and a third was to live with both of them. H.T. August 25, 1989, and report of Dr. Piercy, exhibit "A" at 3.

I

It is against this factual background that Judge Mazur applied the Pennsylvania Adoption Act. In relevant part the Act provides:

§ 2511. Grounds for involuntary termination

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

[or]

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

[and]

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child. The right of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S.A. § 2511 (Purdon Supp. 1990).

Our task, therefore, is to ascertain whether competent evidence supports Judge Mazur's conclusion that Elizabeth M. clearly and convincingly[5] fell within the strictures of

5. Clear and convincing evidence is defined as:

section 2511. We note that section 2511 offers five independent, albeit not mutually exclusive, bases upon which the chancellor might rest a determination of involuntary termination. Judge Mazur considered the propriety of termination under section 2511(a)(2). We will review his conclusions accordingly.[6]

The test of involuntary termination under section 2511(a)(2) has been reduced to a tri-partite test of: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. See *In re Geiger*, 459 Pa. 636, 331 A.2d 172 (1975) (applying section 311(2) of the 1970 Adoption Act, re-enacted verbatim by section 2511(a)(2) of the 1980 Adoption Act). Significant is that the same legal standard, and the same burdens of proof, apply with equal force to proceedings involving termination of parental rights where a parent suffers from a mental and/or physical impairment. See *In re Adoption of J.J.*, 511 Pa. 590, 608, 515 A.2d 883, 893 (1986).

Considering the first prong, the record amply supports a determination that, *at the time the children were removed and placed in foster care*, Elizabeth M. demonstrated a recurring incapacity to provide adequate food, housing and clean living conditions. As for the second prong, we agree further that this incapacity caused the children to be without essential parental care, control or subsistence while in Elizabeth's custody. The substance, however, of appellant's various allegations of error focuses on the third

"testimony [that] is so clear, direct, weighty, and convincing as to enable the [factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *LaRocca Trust*, 411 Pa. 633, 640, 192 A.2d 409, 413 (1963).

6. Our supreme court has determined that "[t]he statutory basis for terminating, involuntarily, the rights of a parent with a mental or physical impairment is ... § 2511(a)(2)." *In re Adoption of J.J.*, 511 Pa. 590, 607, 515 A.2d 883, 892 (1986).

prong and whether such incapacity continues and cannot or will not be remedied within a reasonable amount of time.

■ Initially, we recognize that much of what was problematic at the time of the childrens' removal has since then evanesced; we also are mindful that Elizabeth received advice as to what ultimately was expected of her for the return of Erick and Louis. However, contrary to appellant's interpretation, it would be a myopic reading of the statute to believe that *any progress or change in condition* would mandate non-termination of parental rights. The statute is more practical in design and focuses more acutely on the present and future prospects for the parent to develop the capacity to parent. Competent testimony of Elizabeth's lack of progress and inability to increase her parenting skills counsels against a finding in her favor, improvement in her living conditions notwithstanding.

■ Equally unavailing is appellant's contention that Elizabeth never was afforded an opportunity to receive the full benefit of a plan designed for the return of her children. See *In Interest of C.M.E.*, 301 Pa.Super. 579, 448 A.2d 59, 64 (1982) ("where efforts to secure support services may have been thwarted by the complexities of the jurisdiction of the state welfare agencies ... [and] [w]ithout an opportunity to receive the *full* benefit of the plan devised for the education and possible return of the child to Appellant, her parental rights must take precedence.") (emphasis in original) (footnote omitted). Consistent with Judge Mazur's conclusion, the record clearly suggests the contrary and supports a finding that C & YS changed its goal to adoption only *after* exhausting available services. Testimony from the C & YS and F & CS caseworkers indicates that each offered to Elizabeth what they felt appropriate for a mother in her situation with children placed in foster care. We decline to require more without a showing of bad faith on the part of C & YS and without further guidance from our legislature. In sum, while it is regrettable the lack of programs geared especially for

parents laboring under conditions similar to Elizabeth's,[7] and that this might be reviewed by the appropriate agency is our desire, we find competent evidence to support the view below that Elizabeth was offered a plan for the return of her children *before* C & YS changed its goal to adoption. Cf. *In the Interest of C.M.E., supra.*

█ And finally, appellant contends that the testimony of her incapacity under section 2511(a)(2) was insufficient both in level of expertise and objectivity to constitute clear and convincing evidence. Appellant's argument reduces to the simple allegation that "caseworkers" as a class are unqualified to offer competent evaluations of the capabilities of those parents to whom they are assigned. We perceive this as an issue of credibility and reject it summarily. See *Adoption of S.H., supra.* The degree of specificity, the extent of their observations and the inferences based thereon are, however, subject to review. See *Rinker Appeal, supra.*

As detailed previously, Ms. Allenby testified to Elizabeth's inability to "handle" the children. Ms. Supancic offered corroborating testimony from C & YS business records which included like observations from Ms. Allenby's predecessors and co-workers. Ms. Supancic offered, as well, her opinion that 24–hour assistance would be necessary for Elizabeth to care for the children. Specifically, Ms. Allenby detailed the lack of authority Elizabeth displayed when the environment changed from the narrow confines of the visiting room to the prodigious setting of the outdoors. To be sure, "cannot handle" is a treacherous phrase for it bespeaks a condition not easily put to words, much less defined with precision. And yet, it cannot be doubted that "control" and "authority" are two parental traits essential to the physical and mental well-being of a child.

Further defining the inquiry, we interpret section 2511(a)(2) as directing the Orphans' Court to consider the special needs of these children relative to the minimum

7. See supra note 3.

threshold level of parental competence necessary to safe-
guard their physical and mental well-being. See *In re
Adoption of J.J.*, 511 Pa. at 608, 515 A.2d at 893 (willing-
ness and ability of parent to perform, *at a minimal level,*
his or her parental duties is the test under the Adoption
Act); *In the Interest of Coast*, 385 Pa.Super. 450, 468, 561
A.2d 762, 771 (1989) (en banc) (childrens' retardation and
emotional problems considered when ascertaining their min-
imal needs). The record is replete with references to Erick
and Louis's special needs as testified to by Dr. Piercy:

> They need someone who is very much aware of their
> special needs, who is available to them, to go to school, to
> attend school conferences, to be able to manage the
> behavioral programs that the school devises, so that they
> carry that out in the home, for some continuity, especially
> for Louis, and to provide the kind of attention that their
> special needs require.

H.T. August 25, 1989 at 12. In particular, and referring to
the type of parental attributes necessary to cope with their
special needs, Dr. Piercy noted:

> "I think [they need large doses of attention], plus the
> ability to set limits and structure, on Louis in particular,
> and being able to carry out sometimes rather sophis-
> ticated behavioral modification programs."

H.T. August 25, 1989 at 25.

We feel persuaded that competent evidence of the requi-
site specificity and breadth supports the finding that appel-
lant clearly lacked the capacity to control her childrens'
behavior and to assure, at a minimal level of competence,
for their mental and physical well-being beyond supervised
visitation. At the same time, we feel that the childrens'
special physical and mental needs required particular com-
petence in this area. That this situation had not improved
within a span of approximately six years, and with the
support of various programs, compels the conclusion that
the causes of Elizabeth's incapacity cannot or will not be

remedied by her.[8]  See *In re: Adoption of B.J.R.*, 397 Pa.Super. at 26, 579 A.2d at 914 (in affirming decree of termination, court relied heavily on fact that parent was unable to internalize the skills necessary to provide "consistent structured parenting").  We in no way attribute this to a lack of effort on Elizabeth's part or a want in desire to be reunited with her children.  We simply heed the statutory mandate as interpreted by our supreme court and note that "a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."  *In re William L.*, 477 Pa. 322, 345, 383 A.2d 1228, 1239 (1978) *cert. denied sub nom. Beatty v. Lycoming County Childrens' Services*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978).

Thus having independently adjudged appellant's incapacity, we move next to consider the *separate question* under section 2511(b) whether termination of appellant's parental rights would be consistent with the needs and welfare of her children.  See generally, *Santosky v. Kramer*, 455 U.S. 745, 760, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599, 611 (1982) (until State satisfies burden of parental unfitness, parent's and child's interests must be presumed to converge, *i.e.*, the child's best interests is not properly admissible at the "adjudicatory" stage); *Adoption of R.I.*, 468 Pa. 287, 299 n. 12, 361 A.2d 294, 300 n. 12 (1976) (affirming long-standing principle that needs and welfare must be considered only *after* a finding that the statutory requirements for involuntary termination have been satisfied); *In re Adoption of J.J.*, 511 Pa. at 607, 515 A.2d at 892 (same); cf. *In the Interest of Coast*, 385 Pa.Super. at 458, 561 A.2d at 766 (1989) (reviewing the necessity in a termination hearing of a separate and independent judicial inquiry into parental incompetence as proven only by clear and convincing evidence, and further cautioning that "[t]he term "child's

8.  We note that our decision is based not on abstract notions of Elizabeth's mental incapacity or degree of retardation, but rather on concrete testimony of her incapacity to parent as witnessed first-hand by those testifying—or through competent evidence contained in records made in the ordinary course of business.  See *In re Adoption of J.J.*, 511 Pa. at 607, 515 A.2d at 892 (1986).

needs and welfare" denotes neither a discrete factor which a court must consider, nor a discrete step in a termination *adjudication.*") (emphasis added).

## II

To conclude that appellant is presently incapable and will remain incapable of parenting at the "adjudicatory" stage of a termination proceeding is *not* prima facie evidence for the termination of her parental rights at the "dispositional" stage. See *In the Interest of Coast,* 385 Pa.Super. at 481, 561 A.2d at 779 (Tamilia, J., concurring and dissenting). That is, despite the fact of appellant's incompetence, termination should be denied if additional factors counsel that to do so would *not* serve the needs and welfare of the children. See *In re P.A.B., supra,* (decrying chancellor's failure to consider needs and welfare as a separate and distinct element); cf. *In the Interest of Coast,* 385 Pa.Super. at 458, 561 A.2d at 766 (panel does not quarrel with view that the court still has the power *not* to terminate parental rights even after the statutory requirements under section 2511(a) are met). More poignantly, it is clear that a parent's retardation alone—buttressed, of course, by the requisite factual inquiry into the parent's specific incapacities—is insufficient a basis upon which to terminate parental rights.

Judge Mazur characterized the issue thusly: "[t]he appropriate test is not one of balancing the rights of the parent with the best interests of the child, but the issue to be determined is whether the parent *can provide for the needs and welfare of the child.*" Opinion at 3 (emphasis added). Additionally, while the record reflects a desire by the foster parents to adopt Erick and Louis pending these proceedings, nowhere does Judge Mazur refer to this fact in his final disposition and decree. We feel this type of all or nothing approach ignores the independent value to be found in parental love and bonding that might still exist as between the children and the natural mother despite prolonged separation. To remove this without a thorough consideration of whether the childrens' welfare is safe-

guarded elsewhere might be to substitute nothing in its place. Clearly this runs counter to the childrens' needs and welfare irrespective of other established parental incapacities. And yet, for proof that such a disposition is plausible one need only consider that a petition for involuntary termination might be initiated without any indication that the childrens' minimum needs and welfare are presently being met by pre-adoptive foster parents. See *In re Burns*, 474 Pa. 615, 627, 379 A.2d 535, 541 (1977) (imminency of adoption need not be proven before adoption agency petitions for involuntary termination of parental rights).

We have offered similar reasoning previously, see *In re: P.A.B.*, *supra*, where, there, we considered beneficial the relationship and emotional bond as found between the children and their natural parents. This was so despite testimony describing the difficulty the parents experienced in such routine functions as shopping, dressing the children, administering medication and controlling the childrens' behavior. Animating the court was a belief that removal from the home does not automatically foreclose the potential for the natural parents to maintain an emotional bonding with their children. Counselling against extinguishing this bond, the court saw nothing to take its place:

> In this case, the record only suggests in one statement in testimony that there *may* be a possibility that [the child's] foster parents will adopt her. No alternative permanent situations are on the horizon for [the children]. Thus termination would cut off a natural and beneficial parent-child bond and would not facilitate putting another in its place. Termination would stabilize nothing.

*In re P.A.B.*, 391 Pa.Super. at 91, 570 A.2d at 528 (emphasis in original). On these facts, therefore, we found the childrens' needs and welfare provided for, at least in part, by the natural parents and the bonding existing between them and their children.

Accordingly, we now follow the logic of *In re P.A.B.*, *supra*, and similarly hold that the Orphans' Court failed to consider properly the needs and welfare of the

child as a discrete element under the statute and, thereby, committed an error of law. See *In re Adoption of James J., supra.* However, despite appellant's plea that we remand to consider the extent of the natural parent—child bond, we believe such a course is unnecessary as we hold the record clearly and convincingly supports a view that, when considered under the appropriate test, Erick's and Louis's needs and welfare are adequately safeguarded through termination of their natural mother's parental rights.

■ An examination of section 2511(b), see *supra* Part I for full text, leads us to believe that our attention should be directed toward the following additional factors: (1) whether a necessary and beneficial bond exists between the children and the natural parent, and the related notion, whether the natural parent has evidenced a willingness and desire to maintain the relationship; and (2) whether there are foster parents who have demonstrated a genuine desire and reasonable assurance of their plans to adopt the children. Significantly, if no bonding or otherwise beneficial relationship exists as between the natural parent and the children, and no other reason implicating the childrens' needs and welfare counsels against termination, then termination might be an appropriate course of action *irrespective of the imminency of adoption.* This would be to enable the children to develop a new and meaningful relationship through adoption. See *In re: Adoption of B.J.R.,* 397 Pa.Super. at 27–28, 579 A.2d at 915 (where mother is incompetent and maintains only "tenuous" relationship with child, logic of *William L., supra,* suggests termination of parental rights even where nothing in the record indicates adoption is pending). Following like reasoning, we feel that once a parent is adjudged incompetent under section 2511(a) whereby family unity cannot be preserved, *but where adoption is imminent,* then there is no need to ascertain whether a beneficial bonding exists as between the natural parent and the children, nor whether additional factors counsel

that continuing the relationship might otherwise serve the needs and welfare of the child.

We find the latter situation applicable to the instant case and are persuaded by the reasoning *infra* that this is the proper interpretation of section 2511(b). Initially, we find our statutory mandate abundantly clear: "the court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). No doubt the judicial inquiry is to be centered on the interests of the child, not the fault of the parent. See *In re Adoption of J.J.*, 511 Pa. at 607, 515 A.2d at 892 (1986). Hence, with the child as the focal point it is our belief that "needs and welfare" under section 2511(b), including the intangible component of parental bonding or love, transcends the natural parent's capacity to provide for their satisfaction. Specifically, where pre-adoptive foster parents stand ready to adopt pending termination proceedings this fact unquestionably impacts on the childrens' "needs and welfare" and should factor into the analysis.[9] Cf. *In re P.A.B.*, 391 Pa.Super. at 91, 570 A.2d at 528 (reserving for another day question of whether termination

---

**9.** A note of clarification is in order. Care is to be taken not to confuse our analysis with that under section 2511(a). There, we are limited solely to the question of parental unfitness and, as such, it would be improper to consider the prospects of adoption in satisfaction of the statutory standard. See *Santosky v. Kramer*, 455 U.S. 745, 760, 102 S.Ct. 1388, 1398, 71 L.Ed.2d 599, 611 (1982). But cf., *In the Interest of Coast*, 385 Pa.Super. at 478–81, 561 A.2d at 776–77 (Beck, J., concurring) (concluding that section 2511(a)(5) demands a separate "needs and welfare" inquiry prior to reaching a "second" inquiry into "needs and welfare" under section 2511(b)). Judge Beck reasons that "[n]eeds and welfare is not a concept that fosters parental termination ... it is a concept that inhibits it." While it is true that section 2511(b) "does not contain an additional ground for terminating parental rights; such grounds are contained in section 2511(a) only[,]" see *In re Adoption of Michael J.C.*, 326 Pa.Super. 143, 159, 473 A.2d 1021, 1030 (1984) *rev'd on other grounds*, 506 Pa. 517, 486 A.2d 371 (1984), we believe, however, that once the statutory grounds under section 2511(a) are met, the prospects of adoption cannot be seen as "inhibiting" the termination of parental rights. That such is relevant to the inquiry under section 2511(b) is manifest.

As the issue is not properly before us, we express no opinion as to the propriety of a "dual" "needs and welfare" analysis first under section 2511(a)(5), and then under section 2511(b).

is proper where adoption is assured); *In re Adoption of T.M.,* 389 Pa.Super. 303, 309, 566 A.2d 1256, 1259 (1989) (noting that once statutory grounds for termination are satisfied, "pertinent [is] whether or not reasonable prospects for placement of the children in adoptive homes exist").

Our task at this point, however, is a limited one, one that does not permit a balancing or weighing of the relative capabilities of the natural parents and the pre-adoptive parents to provide for the childrens' needs and welfare. Nor do we perceive our statutory mandate as one of balancing the benefits and added stability of an adoptive home against the benefits of perpetual foster care. See *post,* diss. op. at 1027–1028. Judicial inquiry should not be confused as being interchangeable with a "best interests" type inquiry—a phrase typically associated with child custody proceedings:

> "[needs and welfare] denotes certain *minimum requirements* that all children are entitled to—adequate housing, clothing, food and love—whereas [best interests] connotes a weighing of two adequate but unequal situations...."

*In re Adoption of Michael J.C.,* 326 Pa.Super. 143, 158, 473 A.2d 1021, 1029 (1984), *rev'd on other grounds,* 506 Pa. 517, 486 A.2d 371 (1984) (emphasis added). See also, *In the Interest of Coast, supra,* (decrying "best interests" balancing under section 2511 of the Adoption Act).

We find clear indication from the record confirming an intention by the foster parents to adopt pending these proceedings. H.T. August 29, 1989 at 14, and Exhibit "A" at 1. Accordingly, we hold that where adoption is assured, and where the proper screening safeguards are in place to assure a child a stable environment with adoptive parents,[10]

10. Appellant does not contest the foster parents' suitability in this respect. We note that Dr. Piercy testified as to the foster mother's competence in attending to the childrens' special needs:

> one of the things that was very striking was the way in which [the children] involved the foster mother in their interactions. They

then termination of an incompetent's parental rights conforms with the child's needs and welfare under the Adoption Act, Section 2511(b). In this manner, Erick and Louis's physical and mental well-being is safeguarded, and a sense of stability is added to their lives whereby full legal responsibility for their care and upbringing will become vested in their adoptive parents. See *In re William L.*, 477 Pa. at 348, 383 A.2d at 1241–42 (recognizing the injustice in consigning a child indefinitely to the "limbo" of foster care). We are mindful of the fact that in so holding we disregard what may be a present and continuing beneficial relationship with the natural mother now irretrievably lost; we leave it to our legislature to consider the propriety of this result.

Decree affirmed.

JOHNSON, J., files a dissenting opinion.

JOHNSON, Judge, dissenting:

In this case we are asked the difficult question of whether a retarded mother's parental rights should be terminated, where the children had been removed from her home and placed in foster care, but where the evidence establishes that a strong parent/child bond has developed between the children and the natural mother (Mother) over the ensuing years *and* where the foster parents want to adopt the children. The majority affirms the decree to terminate. Based upon what I find to be the grossly insufficient record, I must dissent.

Mother is mildly retarded; she has a high school diploma from the Mon Valley School for Exceptional Children. Because she was unable to care for her sons, they were

were very engaging of her, and wanted her to observe what they were doing, participate in what they were doing.

.   .   .   .   .

The foster mother was very involved with them, giving them feedback, giving them reenforcement, structuring them ... she did a fine job of setting limits, and they were very responsive to her limit-setting.

H.T. August 25, 1989 at 13.

adjudicated dependent and were placed in a foster home. The majority is correct that the court must, following the finding of Mother's permanent incapacity, enter into a separate determination of whether termination is in the children's best interests. No party in this case advocates sending the children back into Mother's primary care. The children are doing well in the present situation. The real issue is whether the benefits of change in legal status from foster care to adoption, weighed against the harm of taking Mother out of the children's lives, will serve the best interests of the children. Although the record contains evidence to support a finding of the statutory requisite that Mother probably will never be able to provide for her children's needs, the record is devoid of evidence addressing the effect upon the children of cutting off the undisputed beneficial relationship with Mother. Therefore, I would determine that the trial court's decision to terminate is not supported by competent evidence. *In re Adoption of J.J.,* 511 Pa. 590, 593–594, 515 A.2d 883, 885–886. I would vacate the order of termination and remand for a hearing in which this issue could be thoroughly explored.

The statutory basis for termination in this case is:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**— The rights of a parent in regard to a child *may* be terminated after a petition filed on any of the following grounds:

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time *and termination of the*

*parental rights would best serve the needs and welfare of the child.*

(b) Other considerations.—*The court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child.*

. . . .

23 Pa.C.S. § 2511 (emphasis supplied). Section 2511(b) requires that investigation into any and all section 2511(a) grounds for termination be a two-step process. In determining whether the grounds for 2511(a)(5) are met, the court must determine: 1) removal from parental care for at least six months, 2) continued existence of conditions that led to the removal, 3) a finding that the parents cannot or will not remedy these conditions within a reasonable period of time, and 4) a finding that services available are not likely to bring about the remedy of the conditions. *In re P.A.B.*, 391 Pa.Super. 79, 85, 570 A.2d 522, 525 (1990), *petition for allowance of appeal filed* 81 M.Alloc.Dkt. 90 (April 7, 1990).

If these preliminary factors exist, then a court proceeds to the second stage of analysis, whether, given the factual situation with which it is presented, termination will serve the needs and welfare of the child. This second step is not a mere formality following from existence of the four factors in part one; it is a discrete consideration. *In re Adoption of B.J.R.*, 397 Pa.Super. 11, 13–15, 579 A.2d 906, 907–908 (1990); *In re P.A.B.*, 391 Pa.Super. at 85, 570 A.2d at 525; *In the Interest of Coast*, 385 Pa.Super. 450, 561 A.2d 762 (1988), *appeal denied* 525 Pa. 593, 575 A.2d 560 (1990). If 2511(a)(5) is the pleaded ground, then the "needs and welfare" consideration receives double consideration, once in the first stage of finding the statutory requisites, because it is listed as a statutory factor in 2511(a)(5), and again when the court reaches the 2511(b) stage of analysis. This is fitting, because a § 2511(a)(5) situation is one in which the same agency that has already removed the child from the natural parent's home and has assumed an active

role in care for the child and in supervising visitation with the natural parent seeks to terminate the natural parent's rights.

Not only is this second step a separate consideration, but it is one that often weighs against termination, rather than for it. *In the Interest of Coast, In re P.A.B.* It is significant that the legislature said that parental rights *"may,"* not *"must"* be terminated on any of the five grounds enumerated in 2511(a). This "may" is to be read with 2511(b), which, in the statute's context, clearly applies to all five grounds for termination, and which requires that the court "give *primary* consideration to the needs and welfare of the child." A fair reading of the statute's plain meaning yields that, if a parent is incapable of caring for the child, then a court may terminate a natural parent's rights *if* no other factor counterweighs against termination, but a court is not compelled to terminate in any case.

*In re P.A.B.* established that where it was necessary to remove children from mentally disabled parents' homes to provide the children with necessary care, termination may nevertheless not serve the child's needs and welfare when an essential countervailing factor exists, specifically a bond with the natural parent. We emphasized that the unique and irreplaceable nature of the natural parent/child bond can become a compelling reason not to terminate. *See also In re Coast,* Beck, J. concurring. In *In re P.A.B.* there was no adoption pending. We held that termination was not warranted because it would remove from the children the irreplaceable bond with the natural parents with nothing to replace it.

In both this case and in *In re P.A.B.* the parent/child bond is a material factor. Unlike *In re P.A.B.,* the foster parents want to adopt in this case. I cannot agree that the presence of adoptive parents alone allows us to disregard the parent/child bond where no evidence was given on the possible impact of termination of the parent/child relationship upon the children's well-being. I believe that, in order to keep the children's needs and welfare as the focal point,

it must be recognized that termination is a drastic measure. Termination "does more than disrupt a parent/child relationship; it totally destroys it. 'The termination of parental rights ... means that the child is dead so far as the parent is concerned.'" *In re Adoption of Michael J.C.*, 326 Pa.Super. 143, 473 A.2d 1021, 1026 (1984), *rev'd on other grounds*, 506 Pa. 517, 486 A.2d 371 (1984), *citing William L.* The reverse is also true; the parent is dead as far as the child is concerned.

It seems to me that the trial court should look into the effect of the destruction of this relationship if it is going to determine what the children's best interests are. Accordingly, I find no basis, either in the statute or in caselaw, for The majority's conclusion that, "once a parent is adjudged incompetent under 2511(a) whereby family unity cannot be preserved, but where adoption is imminent, *then there is no need to ascertain whether a beneficial bonding exists as between the natural parent and the children, nor whether additional factors counsel that continuing the relationship might otherwise serve the needs and welfare of the child.*" The majority's Opinion at 146–147.

The majority would hold that *as a matter of law*, where adoption is assured, termination of an incompetent parent's rights conforms with the needs and welfare of the child. It suggests that entirely discounting the admittedly beneficial parent/child bond is *compelled* by the statute and that we must "leave it to our legislature to consider the propriety of this result." Opinion at 149. To the contrary, I would decide that the statute does not compel this result:

If the language of the statute creates ambiguity in how it is to be applied to mentally impaired parents, then it is up to the legislature to clarify its application. Our responsibility as an appellate court is to consider the consequences, both legal and practical, of our interpretation. 1 Pa.C.S. § 1921(c)(6). Our underlying concern as we consider this case should be whether an application of 2511(a)(5) that permits termination of the rights of parents who love their children [and whom the children love]

simply because the parents are retarded is consistent with the legislative intent. We conclude that the language of the statute does not require this interpretation.

*In re P.A.B.*, 391 Pa.Super. at 85–86, 570 A.2d at 525.

The majority's conclusion is premised upon its reading of *In re William L.*, 477 Pa. 322, 383 A.2d 1228 (1978), *cert. denied sub nom. Beatty v. Lycoming County Children's Services*, 439 U.S. 880, 99 S.Ct. 216, 58 L.Ed.2d 192 (1978), a reading with which I cannot agree. The majority reads *William L.* to hold that a finding of incurable incapacity of a mentally disabled parent is alone sufficient to require termination. To the contrary, I would conclude that *In re William L.* supports a remand for development of the record in this case.

The *William L.* court decided that the precursor termination statute to 23 Pa.C.S. § 2511, 1 P.S. § 311(2), did not violate parents' due process rights by allowing termination when a natural parent's incapacity, through no fault of the parent, causes the child to be without essential parental care. The court explained that the state has an affirmative duty to protect minor children which overrides the constitutional restraint on state interference in family matters; therefore, this restraint cannot compel the courts to protect parental rights at the expense of ignoring the rights and needs of children. *In re William L.*, 477 Pa. at 337, 383 A.2d at 1236. The comment to the new statute incorporated this idea, stating that inquiry should focus on the welfare of the child rather than on the fault of the parent. 23 Pa.C.S. § 2511, Comment—1970.

However, *William L.*'s holding that the parent need not be at fault before his rights may be terminated does not mean that a finding of a parent's incapacity alone warrants termination as a matter of law. The *William L.* court demonstrated the contrary by proceeding beyond the incapacity issue and conducting a thorough analysis of an adequate record to ascertain all factors that would bear upon the children's welfare. As we recounted in *In re P.A.B.*:

The court considered whether the retardation prevented the mother from properly caring for her sons and by reviewing the evidence concluded that it did. However, it did not accept this conclusion as alone sufficient to meet the terms of the statute. The court found it necessary to carry its analysis one step further to discover whether, as a result of the parent's inability to provide care:

> [T]he parent-child relationship is substantially "weakened by long separation" and cannot be re-established.

*William L.*, 477 Pa. at 350, 383 A.2d at 1242.

*In re P.A.B.*, 391 Pa.Super. at 87, 570 A.2d at 526. Nothing in *William L.* suggests that the re-establishment of the relationship must lead to the child returning to the natural parent's home. The court looked at the value of the relationship alone.

The court recognized two types of "ongoing family relationships" to consider under the second step in the analysis, the relationship with the natural parents, with whom the children no longer lived, and the relationship with the foster parents, with whom the children did live. The court accorded great weight to a potential relationship with the natural parents but found, under the facts before it, that the relationship was weakened by long separation and could not be re-established. Therefore, the court concluded that termination, which would facilitate a future adoption, was necessary:

> In such circumstances, the issue is not whether the state should intrude to disrupt an on-going family relationship, *but whether the state should seek to preserve in law a relationship which no longer exists in fact*, with the result that the child is consigned indefinitely to the limbo of foster care or the impersonal care of institutions.

*In re William L.*, 477 Pa. at 348–349, 383 A.2d at 1241 (emphasis supplied). *See also In re Adoption of B.J.R.*

In the present case the parent/child relationship exists in fact. Even CYS' expert documented that Mother played an important role in the boys' lives. The trial court found this relationship as a fact and the majority agrees. Mother now

lives with a male friend who seems to contribute to the home's stability and with whom the children also have a relationship. Significantly, both children testified that they have two mommies and two daddies and that they love both sets of "parents":

> Dr. Piercy [Patricia Piercy, Ph.D., a psychologist testifying for CYS] recalls the children commenting on their parents. She noted on record and in her attached report Erick's comment that he has "two mommies and daddies," but that he wanted to live with the mommy who was at the session [the natural mother] and the daddy who was at work—referring to his foster father. Louis referred to his foster parents as "mommy and daddy" and also expressed that he had "another mommy and daddy" whom he referred to as Big Lou and Beth [natural mother and her boyfriend]. At one point in the interview Louis indicated that he wanted to live with Beth and Big Lou, but at another time he stated that he would like to live with Marilyn and Ernie—referring to his foster parents. Louis's ambivalence surfaced once again when asked his three favorite wishes, noting that one was to live with Beth and Big Lou, another was to live with Marilyn and Ernie, and a third was to live with both of them.

The majority Opinion at 137. This sort of bond between natural parent and child is unique and irreplaceable. It must be considered no matter what ground for termination is being advanced. This analysis would mandate a consideration of the effect of cutting off these boys from their mother and a balancing of this against the benefits that would inure to them through adoption.

I recognize that CYS' goals for each of its cases is either "return to natural parents" or "adoption." However, I do not accept the assumption that these are the only alternatives that may serve the child's needs and welfare, nor do I accept the assumption that, statutorily, a plan proposing a different sort of arrangement is per se against the child's best interests because it does not plan toward "stability."

Change of legal status from foster parenting to adoption may advance an abstract kind of stability while at the same time undermining the children's needs and welfare. In the present case, I find no evidence in the record supporting why the status quo could not continue.

In *In re P.A.B.* we held that maintaining such a status quo would best serve the children's needs and welfare. In the present case, if, after proper inquiry by the court, CYS is unable to establish that removing Mother from the children's lives would serve the best interests of the children, on the present record I would conclude that maintaining the status quo might serve the children's best interests more than would any other arrangement, including adoption. In this way, as in *In re P.A.B.,* the children will have the benefit of both relationships. Dr. Piercy testified extensively about bonds with both sets of parents. Not one shred of negative testimony regarding the mother's effect on the children surfaced. The children are not confused or otherwise negatively affected by ongoing relationships with both sets of parents. Termination/adoption might simplify things for other parties but not for the children.

In my understanding of the Adoption Act, it is insufficient for the party seeking termination of parental rights to produce evidence only on the parents' incapacity, no matter how voluminous this evidence is. This constitutes only half the case. Under 2511(b), which applies to *all* grounds for termination, the party seeking termination must also produce evidence demonstrating that termination will serve the needs and welfare of the child. In the present case, as in *In re William L., In re P.A.B.* and *In re Adoption of B.J.R.,* this means that it must be proved that termination of a parent-child relationship will not adversely affect the children. In each of these prior cases, the record demonstrated that the trial court heard evidence upon and considered the nature and the significance of the parent-child relationship. In the present case, the record is wholly inadequate on this issue. Therefore, I would remand for development of the record. If CYS cannot sustain its burden of proving, by

clear and convincing evidence, *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) that the effect of cutting the children off from Mother will not be harmful, reversal of the termination order would be warranted.