J-A07017-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: A.M.K., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.A.M. | |
| | No. 1695 WDA 2015 |

Appeal from the Order Entered October 13, 2015
In the Court of Common Pleas of Blair County
Orphans' Court at No(s): CP-7-DP-111-2015

| | |
|---|---|
| IN RE: D.J.M., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.A.M. | |
| | No. 1708 WDA 2015 |

Appeal from the Decree October 13, 2015
In the Court of Common Pleas of Blair County
Orphans' Court at No(s): 2015 AD 34A

| | |
|---|---|
| IN RE: E.J.M., MINOR CHILD | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: R.A.M. | |
| | No. 1709 WDA 2015 |

Appeal from the Decree October 13, 2015
In the Court of Common Pleas of Blair County
Orphans' Court at No(s): 2015 AD 34

J-A07017-16

BEFORE: BOWES, J., MUNDY, J., and JENKINS, J.

MEMORANDUM BY MUNDY, J.:                                    **FILED MAY 27, 2016**

Appellant, R.A.M. (Mother), appeals from the October 13, 2015 decrees involuntarily terminating her parental rights to her sons, E.J.M., born in February 2010, and D.J.M., born in July 2011. In addition, Mother appeals from the order entered that same day, which adjudicated dependent her daughter A.M.K., born in September 2015, and set A.M.K.'s initial permanency goal as adoption.[1] After careful review, we affirm.

On October 17, 2014, Blair County Children, Youth and Families (CYF) filed dependency petitions with respect to E.J.M. and D.J.M.[2] In its petitions, CYF averred that E.J.M. and D.J.M. resided with Mother in the home of their maternal grandmother, P.M. **See** Dependency Petition, 10/17/14, at 7 (Allegations of Dependency at ¶ 4a). During visits to the home, a CYF caseworker discovered that E.J.M. and D.J.M. were being locked in a room with a "half-door" for extended periods of time, and that Mother did not respond when E.J.M. and D.J.M. would yell or make noises. **Id.** On October

_____

[1] The decrees also terminated the parental rights of E.J.M.'s father, P.F., and D.J.M.'s father, J.S. The father of A.M.K. is Mother's current boyfriend, M.K. None of these individuals has filed a brief in connection with the instant appeal, nor have they filed their own separate appeals. Additionally, we note that the orphans' court opinion mistakenly identifies A.M.K. as "A.K.M." in several places.

[2] In addition, CYF filed applications for emergency protective custody and shelter care applications.

- 2 -

15, 2014, a service provider visited the home, and heard D.J.M. crying and screaming. *Id.* (Allegations of Dependency at ¶ 4d). However, no one in the home went to check on D.J.M. until the service provider asked them to do so. *Id.* Upon examining D.J.M., the service provider discovered that D.J.M. had what appeared to be a large splinter in his foot. *Id.* The service provider then "had to 'force' the family" to take D.J.M. to the hospital. *Id.* On October 16, 2014, CYF received a report from the hospital indicating that D.J.M. had shards of glass in his foot, and that the foot was badly infected. *Id.* CYF was granted emergency protective custody of E.J.M. and D.J.M. on October 16, 2014. *Id.*

A dependency hearing was held before a master on October 24, 2014, and the master issued a recommendation that E.J.M. and D.J.M. be adjudicated dependent. On October 30, 2014, the master's recommendation was adopted as an order of court. A permanency review and goal change hearing was conducted on April 22, 2015. On April 27, 2015, the orphans' court entered permanency review orders which changed the permanency goals of E.J.M. and D.J.M. to adoption. CYF filed petitions to involuntarily terminate Mother's parental rights to E.J.M. and D.J.M. on August 17, 2015.

As noted above, A.M.K. was born in September 2015. CYF filed an application for emergency protective custody and a shelter care application two days after A.M.K.'s birth, and the orphans' court entered an order for

emergency protective custody. CYF filed a dependency petition with respect to A.M.K. on September 16, 2015.

The orphans' court held a combined permanency review, termination of parental rights, and dependency hearing on October 6, 2015. On October 13, 2015, the orphans' court entered its decrees terminating Mother's parental rights to E.J.M. and D.J.M., and its order adjudicating A.M.K. dependent and setting A.M.K.'s initial permanency goal as adoption.[3] Mother timely filed notices of appeal as to the termination decrees on October 21, 2015. She timely filed a notice of appeal as to the dependency order on October 22, 2015. Mother included a concise statement of errors complained of on appeal with each notice of appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i). On November 4, 2015, this Court consolidated Mother's appeals *sua sponte*. **See generally** Pa.R.A.P. 513. The orphans' court filed its Rule 1925(a) opinion on November 17, 2015.

On appeal, Mother raises the following issues for our review.

> I. Whether the evidence was sufficient to support termination of parental rights under 23 Pa.C.S.A. § 2511(a)(2)?

_____

[3] We note that, at the hearing, the guardian *ad litem* (GAL) for E.J.M. and D.J.M. agreed that termination was in their best interests. The GAL noted the progress the boys had made from being essentially non-verbal to now speaking. N.T., 10/6/15, at 69. He further noted, "[t]hey're completely active, you can tell; they're running all over the place. They're just two happy boys in a very good and safe environment." **Id.**

II. Whether the evidence was sufficient to support termination of parental rights under 23 Pa.C.S.A. § 2511(a)(5)?

III. Whether the evidence was sufficient to conclude that termination of parental rights is in the children's best interests?

IV. Whether the evidence was sufficient to support findings that [A.M.K.] is a dependent child, that placement is necessary, and that a goal of adoption is appropriate?

Mother's Brief at 13.

We first address Mother's claims relating to the involuntary termination of her parental rights with respect to E.J.M. and D.J.M. In reviewing an appeal from decrees terminating parental rights, we are guided by the following standard.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), and (b). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the orphans' court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

…

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

…

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the orphans' court found that Mother suffers from a significant intellectual disability, which renders her incapable of providing for the safety of E.J.M. and D.J.M. without constant assistance from an

appropriate caregiver. Orphans' Court Opinion, 11/17/15, at 10. The orphans' court observed that no such caregiver has been identified. *Id.* The orphans' court noted that Mother has a history of forming relationships with violent men, who have abused both her and her children. *Id.* at 11. The orphans' court also noted that Mother has been offered services and that she has failed to make progress toward reunification. *Id.* at 12.

In response, Mother argues that the only evidence offered to prove the existence or severity of her intellectual disability was the report and testimony of psychologist, Marolyn Morford, Ph.D. Mother's Brief at 19. According to Mother, this evidence was merely speculative, because, *inter alia*, Dr. Morford failed to conduct an IQ test. *Id.* at 18-19. Mother insists that the existence of an intellectual disability, by itself, does not establish that she is incapable of parenting E.J.M. and D.J.M. *Id.* at 19. Mother suggests that she has demonstrated an ability to recognize safety concerns and that she has completed a domestic violence program. *Id.* at 19, 21-22. Mother also asserts that she has established a stable home with her boyfriend, M.K., and that she is capable of caring for E.J.M. and D.J.M. with his support and with the support of their respective families. *Id.* at 17, 21.

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion. At the start of the October 6, 2015 hearing, the parties stipulated to the incorporation of Dr. Morford's prior testimony from the April 22, 2015 permanency review and goal change

hearing. N.T., 10/6/15, at 4. The parties also stipulated to the incorporation of Dr. Morford's psychological evaluation of Mother. *Id.* In her psychological evaluation, Dr. Morford explained that she assessed Mother's intellectual ability using a screening instrument known as the PPVT-4. Psychological Evaluation (Petitioner's Exhibit 1), at 5. Mother scored a 57 on the PPVT-4, with a "true score range" of 51-68. *Id.* Dr. Morford noted that Mother scored better than less than one percent of the population her age, and that Mother's age equivalent was eight years and five months. *Id.* at 5-6. Dr. Morford explained that she was unable to administer a personality test to Mother, due to Mother's limited language abilities. *Id.* at 6.

Ultimately, Dr. Morford determined that Mother's weaknesses include intellectual limitations, impaired judgment, a dependent personality, and vulnerability to unhealthy romantic relationships. *Id.* at 5. Dr. Morford stated that Mother can be passive and dependent on her boyfriends and on her mother, which "can affect parenting in terms of being firm about keeping her children safe from others." *Id.* at 6.

At the conclusion of her report, Dr. Morford offered the following discussion with regard to Mother's parenting ability.

> [Mother's] parenting ability is promising, with family and community support. She shows interest and appropriate interaction with the children, but can be distracted. She may tire and lose interest in the children, due to a focus on getting her own needs (PS2 game playing met, [*sic*] social interaction).

> She has a history of having relationships with aggressive men who posed a risk to her children. Supervision of her own children was apparently a problem since, although she was present, she could not be guaranteed to keep them safe inside the house, thus the solution of locking them in their room. She can show a good interaction style with the children. It appears that her problem solving ability regarding their safety or long term needs is limited by her overall judgment.

*Id.* at 7-8. Concerning the extent to which Mother should be involved in the lives of E.J.M. and D.J.M. moving forward, Dr. Morford stated, in pertinent part, "If [Mother] were to rely on her family's advice and access services provided to her, including regular supervision of her home and the children with her, she could remain in a parenting role. I do not see her parenting these children safely on her own." *Id.* at 8.

During the hearing on April 22, 2015, Dr. Morford testified that it was "a lot questionable" whether Mother could function as an independent, long term, and safe caregiver for E.J.M. and D.J.M., in light of her intellectual disability and her tendency to be involved with dangerous men.[4] N.T., 4/22/15, at 53. Dr. Morford agreed that Mother would require supervision "from either the agency or a responsible family member essentially on a

_____

[4] Concerning Mother's intellectual disability, Dr. Morford acknowledged that the PPVT-4 is a language comprehension test, and that she did not administer a "full IQ test" to Mother. N.T., 4/22/15, at 52. However, Dr. Morford explained that the PPVT-4 "provides an IQ. In other words, … it uses the same range as an IQ test …." *Id.*

24/7 basis[,]" in order for E.J.M. and D.J.M. to be returned to her care. *Id.* at 48-49. When asked what sort of individual would be needed to supervise Mother, Dr. Morford offered the following description.

> Well it would be someone with enough capacity that they would feel confident. If I could just add that when people do have intellectual disabilities they could be --- they could be very passive or passive to a certain context because they defer to other people to make decisions for them and they do not feel they're competent in making decision[s] themselves. So it would need to be someone who is of fairly average intellectual emotional capacity who would feel comfortable separating the children from their parents or the mother, (inaudible) developed if necessary or talk with someone specifically about separation. You could call for outside services that they feel necessary and someone who has some education in parenting behaviors and expectations, the children's behavior so that they can interpret for these parents, the mother, what is appropriate, normal behavior in children and what behaviors need to be addressed.
>
> …
>
> I think that person would have to be available almost constantly given the choices that she's made and her tendency to externalize responsibility and not take that responsibility herself. I would have serious concerns about the safety of the children in her care alone at any time because I don't think she's able to keep her children from being harmed by other individuals.

*Id.* at 56-59.

At the October 6, 2015 hearing, the orphans' court heard the testimony of CYF caseworker, Ronna Holliday. Ms. Holliday testified that Mother and M.K. have failed to identify an appropriate supervisor. N.T.,

10/6/15, at 8-9, 26-27. Ms. Holliday noted that the brother of M.K., J.K., had offered to move in with Mother and M.K., but later withdrew that offer. *Id.* at 9. Ms. Holliday further testified that CYF did not consider M.K. to be an appropriate support person for Mother. *Id.* at 25. Ms. Holliday explained that CYF has been informed that Mother and M.K. argue, and that Mother "admitted to us at one time that she had to ask [M.K.'s] mother if she thought [M.K.] would hit her and, of course, that raised some red flags with the Agency." *Id.* at 14. Ms. Holliday also noted that M.K. has a criminal record and anger management issues.[5] *Id.* at 10, 13.

Accordingly, the record supports the conclusion of the orphans' court that Mother remains incapable of parenting E.J.M. and D.J.M., and that she cannot, or will not, remedy this incapacity. The report and testimony of Dr. Morford establish that Mother suffers from a significant intellectual disability, which prevents Mother from providing a safe environment for E.J.M. and

_____

[5] During the October 6, 2015 hearing, the parties stipulated that the witnesses of CYF, if called to testify, would testify consistent with the allegations contained in A.M.K.'s dependency petition. N.T., 10/6/15, at 2-3, 70. According to the dependency petition, M.K. has been convicted of several criminal offenses, including a guilty plea to simple assault on January 25, 2013, for which M.K. received probation, and a guilty plea to simple assault on November 17, 2014, for which M.K. received a sentence of six months to twenty-three months and fifteen days of incarceration. Dependency Petition, 9/16/15, at 8 (Allegations of Dependency at ¶ 2a). The petition also indicated that M.K. is "limited in functioning and …admittedly has an ongoing problem developing skills to cope with his anger and the ability to process it appropriately." *Id.* (Allegations of Dependency at ¶ 4c).

D.J.M. without constant supervision. Moreover, no appropriate supervisor has been identified that would allow Mother to achieve reunification. While Mother currently resides with M.K., he is not an appropriate supervisor for Mother, due to his cognitive limitations, anger management issues, and history of violent crime. Accordingly, we agree with the orphans' court that the Agency met its burden under Section 2511(a)(2).

We next consider whether the orphans' court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

- 13 -

***In re Adoption of C.D.R.***, 111 A.3d 1212, 1219 (Pa. Super. 2015), *quoting*

***In re N.A.M.***, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and

citations omitted).

Here, the orphans' court acknowledged that Mother has a loving bond

with E.J.M. and D.J.M.  Orphans' Court Opinion, 11/17/15, at 10.  However,

the orphans' court also determined that Mother is unable to parent E.J.M.

and D.J.M. safely.  ***Id.*** at 10-11.  The orphans' court concluded that the

needs and welfare of E.J.M. and D.J.M. would best be served by terminating

Mother's parental rights, so that E.J.M. and D.J.M. can remain in their pre-

adoptive foster home, where their needs are being met, and where they are

provided with safety and security.  ***Id.*** at 10, 13.

Mother argues that she has a healthy bond with E.J.M. and D.J.M., and

that the orphans' court failed to adequately discuss "the nature and extent"

of this bond.  Mother's Brief at 22-23.  Mother emphasizes ***In re P.A.B.***, 570

A.2d 522 (Pa. Super. 1990), *appeal dismissed* 607 A.2d 1074 (Pa. 1992), in

which this Court reversed an order terminating the parental rights of the

intellectually-disabled appellant parents, and ***In re E.M.***, 620 A.2d 481 (Pa.

1993), in which our Supreme Court reversed the order of this Court

affirming the termination of parental rights with respect to an intellectually-

disabled mother.

We again discern no abuse of discretion.  During the underlying

proceedings, there was no dispute that E.J.M. and D.J.M. share a bond with

Mother. At the April 22, 2015 hearing, Kids First family preservation reunification worker, Shannon Cameron, testified that Mother is "[k]ind, gentle, appropriate, [and] loving[,]" during her visits with E.J.M. and D.J.M. N.T., 4/22/15, at 21. Ms. Cameron agreed that Mother should have ongoing contact with E.J.M. and D.J.M., and stated, "I think it would be devastating for those boys not to have some kind of contact with [Mother]. They love her." *Id.* Concerning D.J.M. in particular, Ms. Cameron explained that he has difficulty leaving Mother at the end of visits, and that "the separation from his mom hurts him." *Id.* at 32.

However, the orphans' court was well within its discretion when it concluded that the existence of this bond should not prevent Mother's parental rights from being terminated. Failing to terminate Mother's parental rights would cause both of these children to languish in foster care indefinitely, and would deny them the opportunity to find a permanent and stable home. As observed by the orphans' court, E.J.M. and D.J.M. currently are in a pre-adoptive foster home. During the October 6, 2015 hearing, CYF casework supervisor, Deawna Wyandt, testified that E.J.M. and D.J.M. are bonded with their pre-adoptive foster parents. N.T., 10/6/15, at 60. Ms. Wyandt stated, "I have seen that these foster parents are very committed to doing whatever is asked and needed for these children. They want to see these children succeed." *Id.*

Further, we reject Mother's argument that we must reverse the subject termination decrees in light of **P.A.B.** and **E.M.** In **P.A.B.**, this Court reversed a termination order because the orphans' court "acknowledged but did not consider" the bond between the appellant parents and their children, and because this Court's review of the evidence indicated that termination would not be in the children's best interest. **P.A.B.**, **supra** at 525-528. In reaching its conclusion, this Court emphasized that there was no pre-adoptive resource in place for the children in the event that the appellant parents' rights were terminated, and that "termination would cut off a natural and beneficial parent-child bond and would not facilitate putting another in its place. Termination would stabilize nothing." **Id.** at 528. In **E.M.**, our Supreme Court reversed on the basis that the bond between the appellant mother and her children had not been fully explored or considered. **E.M.**, **supra** at 485. These cases are readily distinguishable from the instant matter. As noted above, testimony was presented concerning the nature of the bond between E.J.M., D.J.M., and Mother, and it is clear that the orphans' court considered the existence of this bond when deciding to terminate Mother's parental rights. In addition, E.J.M. and D.J.M. are in a pre-adoptive foster home, and they are bonded with their foster parents.

We next turn our attention to Mother's claim that the orphans' court abused its discretion by adjudicating A.M.K. dependent, and setting her initial permanency goal as adoption.

We consider this claim mindful of the following.

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013), *quoting **In re R.J.T.**,* 9 A.3d 1179, 1190 (Pa. 2010).

Dependency proceedings are governed by the Juvenile Act, 42 Pa.C.S.A. §§ 6301-6375. The Juvenile Act defines "dependent child" as follows, in relevant part.

> **"Dependent child."** A child who:
>
> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk, including evidence of the parent's, guardian's or other custodian's use of alcohol or a controlled substance that places the health, safety or welfare of the child at risk[.]

*Id.* § 6302. "[T]he dependency of a child is not determined 'as to' a particular person, but rather must be based upon two findings by the trial court: whether the child is currently lacking proper care and control, and whether such care and control is immediately available." *In re J.C.*, 5 A.3d 284, 289 (Pa. Super. 2010) (citations omitted).

In the present matter, the orphans' court found that A.M.K. should be adjudicated dependent as a result of Mother's intellectual disability, and her inability to parent A.M.K. safely. Orphans' Court Opinion, 11/17/15, at 13. The orphans' court also emphasized the cognitive limitations and anger management issues of M.K. *Id.*

In response, Mother again argues that the evidence does not support the findings of the orphans' court concerning the severity of her intellectual disability and that she is capable of recognizing safety concerns. Mother's Brief at 24. Mother also challenges the orphans' court's finding that M.K. is unable to cope with his anger management issues. *Id.* Mother insists that she and M.K. are capable of caring for A.M.K. with the support of family members, and that A.M.K. will not be in any danger if placed in their care. *Id.* at 24-25. Mother states that, in the alternative, both she and M.K. are capable of learning how to care for A.M.K. *Id.* at 25. Finally, Mother suggests that the orphans' court should have employed concurrent planning and provided A.M.K. with concurrent permanency goals of reunification and adoption, instead of setting her permanency goal as adoption at the outset. *Id.*

We again conclude that Mother is not entitled to relief. As we have discussed throughout this memorandum, the record supports the findings of the orphans' court that Mother suffers from a significant intellectual disability, and that she is incapable of ensuring the safety of her children,

including A.M.K. Further, M.K. has his own host of issues which prevent him from caring for A.M.K., or supervising Mother, including cognitive limitations, anger management issues, and a history of violent crime.

We also reject Mother's claim that the orphans' court abused its discretion by failing to set concurrent permanency goals of reunification and adoption. There is no minimum period of time that a child's permanency goal must be set at reunification before it can be changed. *See, e.g.*, *In re M.S.*, 980 A.2d 612 (Pa. Super. 2009), *appeal denied*, 985 A.2d 220 (Pa. 2009). In *M.S.*, the lower court set the child's initial permanency goal as adoption, despite the fact that aggravated circumstances had not been found. A panel of this Court affirmed, explaining as follows.

> [T]he lack of any aggravating circumstances attributable to the parent Appellant … did not prohibit the trial court from authorizing immediate termination of family unification. Stated otherwise, the initial permanency goal for M.S. need not be set at reunification, especially since [the Agency] has provided any and all reasonable services to assist Appellant toward this end without success.

*Id.* at 615-616.

Similarly, our review of the record in the instant matter reveals that Mother has participated in a variety of services, and that Mother's parental incapacity has not been remedied. We further observe that our Supreme Court has cautioned against the use of concurrent planning when "it becomes clear that parents will be unable to provide their children's basic

- 19 -

needs in the near future." ***T.S.M.***, ***supra*** at 270. Such is the case here, and we discern no abuse of discretion.

Based on the foregoing, we conclude that the orphans' court did not abuse its discretion by terminating Mother's parental rights with respect to E.J.M. and D.J.M., and by adjudicating A.M.K. dependent and setting her initial permanency goal as adoption. ***See T.S.M.***, ***supra***; ***A.B.***, ***supra***. Accordingly, we affirm the October 13, 2015 decrees and October 13, 2015 order of the orphans' court.

Decrees affirmed. Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/27/2016