J-S18045-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.D.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF:  S.E.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1995 MDA 2019 |

Appeal from the Decree Entered November 12, 2019
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
86750

| | | |
|---|---|---|
| IN THE INTEREST OF: H.A.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.E.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1996 MDA 2019 |

Appeal from the Decree Entered November 12, 2019
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
86749

BEFORE:   KUNSELMAN, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED APRIL 17, 2020**

S.E.P. ("Mother") appeals from the Decrees entered on November 12, 2019, which granted the petition of Berks County Children and Youth Services ("BCCYS"), and involuntarily terminated Mother's parental rights to her two

---

[*] Former Justice specially assigned to the Superior Court.

biological children: H.A.K. (born in January of 2015) and H.D.K (born in March of 2016) (collectively "the children").[1]  After a careful review, we affirm.

The Orphans' Court has thoroughly set forth the relevant facts and procedural history as follows:

> BCCYS first became involved with the family in 2016 due to concerns of unstable housing and income, mental health issues, medical neglect, and domestic violence.  On January 11, 2017, BCCYS received a report that [H.A.K.] fell down a flight of stairs and fractured her femur.  Mother stated that a maternal aunt was caring for [H.A.K.] at the time of the incident.  The family was then opened for investigation [sic].
>
> During the investigation, it was discovered that Mother was missing medical appointments for both of [the] children.  Both of [the] children suffer from neurofibromatosis type 1 ("NF1").  (N.T. 11/4/19 at 42). NF1 is a hereditary genetic disorder that affects multiple systems of the body.  Amongst the symptoms are skin changes, benign growths on body areas, skeletal abnormalities (such as scoliosis or bowing of the legs)[,] and learning disabilities.  There is also a risk of developing optic pathway gliomas which are tumors in the optic pathway.  **Id.**  Mother also suffers from NF1.
>
> In addition to [the] children suffering from NF1, [H.A.K.] suffers from a rare disease known as Moya Moya disease.  This is a rare disease of the blood vessels.  Both of [H.A.K.'s] carotid arteries are affected by this.  More specifically, [H.A.K.'s] right carotid artery is completely blocked and will never be unblocked.  (N.T. 11/4/19 at 42).  This disease puts [H.A.K.] at a high risk of an ischemic stroke and intracerebral hemorrhage which can be provoked by fluctuations in her blood pressure or dehydration.
>
> As a result of their medical conditions, [the children] require routine appointments with neurology, hematology, oncology[,] and ophthalmology.  Additionally, [H.A.K.] was required to follow

---

[1] The Orphans' Court noted that the parental rights of Father, who is incarcerated at a state correctional institution in North Carolina due to felony charges related to the sexual assault of a minor less than sixteen years of age, were also terminated.  **See** Orphans' Court Opinion, filed 1/8/20, at 6 n.4.  Father has not filed an appeal.

up with Penn Dental as a result of not properly having maintained her teeth. *Id.* at 42-43.

On May 16, 2017[,] [H.D.K.] was admitted to the hospital for dehydration and a double ear infection. Mother struggled with insight into the medical situation.

[H.A.K.] was scheduled for brain surgery on December 6, 2017[,] at the Children's Hospital of Philadelphia ("CHOP"). Despite this, the caseworker from CHOP reported that Mother failed to keep numerous appointments for [the] children. [The] children missed oncology and ophthalmology appointments on July 11, 2017[,] and July 25, 2017. Another oncology appointment was missed on August 21, 2017. [The] children missed oncology and ophthalmology appointments on October 13, 2017[,] and October 19, 2017. Mother missed her own NF1 oncology appointment on July 19, 2017.

On December 6, 2017[,] [H.A.K.] underwent her scheduled brain surgery at CHOP. [H.A.K.] was kept overnight and not released due to concerns that [H.A.K.] would not receive proper hydration at home. The discharge summary also stated that Mother was no longer allowed to stay at the Ronald McDonald House due to not adequately supervising [the] children.

Mother *did not* take [H.A.K.] for her follow up appointment with the neurosurgeon on January 2, 2018. Later in January 2018 Mother reported to the caseworker that she was moving into a shelter with the children. When asked if [the children's biological father] could provide assistance, Mother indicated that he could not provide any relief and that he was very abusive to her.

On February 7, 2018[,] CHOP Social Worker Heather Deline advised Mother that [H.A.K.] needed to be evaluated by the Intermediate Unit due to speech delays and should be enrolled in a Head Start Program. The following day, on February 8, 2018[,] Mother's home was raided by the police with weapons drawn. Mother stated the children were present and that it was "scary."

On February 15, 2018[,] CHOP Social Worker [Deline] advised that Mother has not had medical care for her own NF1 "for a long time." On the same day, Mother had an interview at Family Promise for one of the housing programs. Mother was denied due to being unable to provide [H.D.K.'s] age or social security number. Mother also gave incorrect information about her own prior addresses. Mother further indicated that she has not received medical treatment for her own bipolar disorder and

schizophrenia. Finally, she falsely indicated that [H.A.K.] had brain cancer.

On February 16, 2018[,] it was reported by the Reading Children's Health Center that both children were underweight, that [H.A.K.] should have been moved from Early Intervention to Berks County Intermediate Unit and that [H.D.K.] has not had a follow-up with his ophthalmologist.

From January 2017 to February 2018[,] BCCYS had been providing weekly services and Mother has moved residences seven (7) times.

\*\*\*

On February 22, 2018[,] BCCYS filed a dependency petition regarding [H.A.K.] and [H.D.K.] as a result of their concerns. When notified, Mother fled to New Jersey with [the] children. On February 28, 2018[,] Mother moved to Northampton County. On March 12, 2018[,] Mother met with BCCYS caseworker Richelle Smith and reported that she was now residing in the State of Maryland and that she wanted to give custody of [the] children to her brother.

Based on Mother's actions, an Emergency Petition was filed by BCCYS. [The Orphans' Court] transferred custody of [the] minor children to BCCYS as remaining in the home with Mother was "contrary to the welfare of the child[ren]."

On March 23, 2018[,] an Adjudication and Disposition hearing was held [in the Orphans' Court]. At that time, the Court adjudicated [the] children as dependent, removed them from the care of Mother and into the custody of BCCYS (kinship care). Further, Mother was ordered to cooperate with the following: (1) parenting education on attending to the children's medical needs, (2) mental health evaluation with IQ testing and any additional recommendations, (3) psychiatric evaluation and any additional recommendations, (4) domestic violence evaluation and any recommendations, (5) casework sessions and any additional recommendations, (6) establishing and maintaining stable and appropriate housing and income, (7) keeping BCCYS informed regarding any changes in residence or income, (8) signing releases as required, (9) ensuring that the children attend all medical appointments, and (10) supervised visits and acting in an appropriate manner.

\*\*\*

Permanency Review hearings were held on August 21, 2018, January 15, 2019[,] and June 3, 2019. [BCCYS filed petitions to involuntarily terminate Mother's parental rights as to the children on May 24, 2019.]

At the Permanency Review hearing on August 21, 2018, it was found that Mother had made no progress towards alleviating the circumstances which necessitated the original placement. Notably, Mother did not maintain stable employment [and] did not consistently attend casework with BCCYS[.] [S]he participated in casework with Child and Family First but failed to follow through with recommendations including following through with community resources for housing. Mother was provided reminders and transportation to the children's medical appointments at CHOP but demonstrated an inability to understand the medical information.

At the time of the August 21, 2018[,] hearing, it was reported that two of Mother's sisters had, on two (2) separate occasions, taken the children from the kinship home; they lied to the kinship resource about their plans and took the children to see…Mother. This was unauthorized contact with Mother and done without the knowledge of the kinship resources. Neither aunt was authorized by BCCYS to supervise contact with Mother. Mother acknowledged that she knew this was wrong but did so anyway. She further acknowledged that the visiting supervisor arrived in time to see the two sisters bringing [the] children. (N.T. 11/4/19 at 32). Full-time supervised visits were enforced, and Mother attended all [of] those visits.

At the Permanency Review hearing on January 15, 2019, it was noted that Mother had been substantially compliant with the permanency plan and had made substantial progress. The Findings of Fact indicate that Mother moved residences twice and left one job and was now working with another employer on a part-time basis. Mother participated in casework with BCCYS and with Child and Family First. It is also noted that Mother attended all offered visits and that her interaction with the children was appropriate. Mother also was attending the medical appointments[,] and…she was able to effectively manage each child and was engaged when receiving medical information. It was further noted that Mother and [the] children were clearly bonded to one another.

At the final Permanency Review hearing held on June 4, 2019[,] it was found that Mother was in substantial compliance

with the permanency plan[;] however[,] "there has been minimal progress toward alleviating the circumstances which necessitated the original placement." While Mother had maintained stable housing and was consistent in her casework with BCCYS and Child and Family First, it was unfortunately noted that Mother had again quit her job because she was unhappy. She failed to secure alternate employment before quitting[,] and she declined temporary assignments because she did not want to go from job to job. Mother was offered visits in her home, semi-supervised. During these visits, Mother was unable to comply with restrictions regarding additional people at visits and, therefore, full supervision was resumed.

While it was noted that Mother enjoyed the visits, she remained unable to supervise the children without adult assistance. She was not consistent with discipline and did not follow through. Mother was unable to remember information provided at meetings and medical appointments. Mother acknowledged missing two medical appointments for [the] children. (N.T. 11/4/19 at 26, 43). Mother initially had taken over the responsibility to schedule medical appointments but was unable to do so; the responsibility returned to foster mother. Mother did not seem to understand questions asked of her regarding the children, such as whether lunch was provided. Mother also failed to bring required documentation to appointments.

***

As discussed above,…Mother [was required] to participate in professional services. These included domestic violence counseling, mental health evaluations, and any other services that were recommended.

On June 20, 2018, Mother was referred for an Adult Alternatives to Violence Evaluation at Commonwealth Clinic. At that time, Mother acknowledged physical and verbal abuse by the children's father. She described coercion, threats of violence, intimidation[,] and emotional abuse. She also described an extensive history of childhood victimization of sexual, verbal[,] and emotional abuse that has developed into a pattern of her own abusive relationships as an adult. In a report dated January 2, 2019[,] from Commonwealth Clinic, it was noted that Mother's inconsistent attendance has caused her to make limited progress in addressing her unresolved trauma. She was noted to experience low self-esteem and limited assertiveness skills.

- 6 -

Notably, at the final Permanency Review hearing on June 4, 2019, it was noted that Mother's attendance was inconsistent and Commonwealth Clinic Group ("CCG") questioned the veracity of the information that was provided by Mother. In a May 30, 2019[,] report from CCG, it was noted that Mother presented with an emotional dependence on men and that she had been in an intimate partner relationship with an unidentified male. CCG noted that Mother seemed to be minimizing the significance of this relationship due to her court involvement. Mother eventually disclosed that she had entered [into] a relationship with a man named Christian. She reported that the relationship was exclusive "but not yet serious."

At the [termination] hearing that was held before [the Orphans'] Court on November 4, 2019[2] Mother testified that she was eight (8) months pregnant and that the father was a man named Christian Diaz-Cruz. Mr. Diaz-Cruz is an individual with a criminal history of aggravated assault and drug charges. (N.T. 11/14/19 at 20).

Mother was also referred for a Mental Health intake at Berks Counseling Center ("BCC"). Her first appointment was on August 16, 2018. She was recommended to participate in a Level I Mental Health Program. On March 29, 2019, BCC reported that Mother had completed her treatment goals and she was successfully discharged from the Level I Mental Health Program.

Mother also attended a Forensic and Intellectual Evaluation at Spring Psychological Associates on April 30, 2018[,] with Dr. Richard Small. Dr. Small opined Mother's intelligence falls in the lower end of the mild intellectual disability range, and she shows both psychotic and dependent tendencies. Dr. Small diagnosed Mother with Intellectual Disorder, Mild; Schizoaffective Disorder, Bipolar Type; Obsessive Compulsive Disorder, and Personality Disorder with Schizoid and Dependent Features. Dr. Small did not believe Mother was able to provide a safe environment for [the]

---

[2] During the termination hearing, Mother was represented by counsel. The children were represented by Daniel H. Degler, Esquire, guardian *ad litem*. H.A.K. was four years old, and H.D.K. was three years old at the time of the termination hearing. There is no indication of a conflict between the children's legal and best interest or a conflict in each other's interests. ***See In re T.S.***, 648 Pa. 236, 192 A.3d 1080, 1089-90, 1092-93 (2018) (reaffirming the ability of an attorney-guardian *ad litem* to serve a dual role and represent a child's non-conflicting best interests and legal interests).

children or meet their special needs. He was pessimistic about Mother's ability to make improvements.

At the request of Mother's attorney, Mother and [the] children attended a Bonding Evaluation on July 25, 2019. This evaluation was performed by Laura M. Fritts, Psy.D., LMFT. Dr. Fritts noted that a genuine closeness and familiarity was apparent between Mother and the children. Dr. Fritts opined that they "clearly love her and are well bonded to her." Dr. Fritts observed that Mother had genuine affection for both of [the] children; she was patient and she was appropriately prepared with supplies; she engaged them on the floor with games. Dr. Fritts also observed however that while [the] children were animated, bright, alert, playful and engaged, Mother appeared "more remote."

Dr. Fritts further noted that Mother did not appear as attached and bonded to [the] children as they were to her. Mother was not indifferent to [the] children "but she was also not as well bonded as one would hope to see." Importantly, Dr. Fritts noted that the children "appeared quite bonded with her but more as a friend and playmate whom they love than as their mother."

At the conclusion of the evaluation, Dr. Fritts noted that while the children were happy to see their mother and engaged well with her, they had no separation issues "nor were any concerns raised with regard to leaving their mother when the session ended."

Orphans' Court Opinion, filed 1/8/20, at 5-12 (citations to exhibits and footnotes omitted) (footnote added) (italics in original).

By Decrees entered on November 12, 2019, the Orphans' Court found clear and convincing evidence to involuntarily terminate Mother's parental rights as to the children under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). The Orphans' Court additionally concluded that termination of Mother's parental rights was in the best interest of the children under 23 Pa.C.S.A. § 2511(b).

Mother filed two separate timely, counseled notices of appeal, each containing a single Orphans' Court docket number pertaining to each child. Additionally, Mother filed two counseled statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925. On December 26, 2019, this Court *sua sponte* consolidated Mother's notices of appeal, and on January 8, 2020, the Orphans' Court filed an Opinion pursuant to Pa.R.A.P. 1925(a).

On appeal, Mother sets forth the following issues in her "Statement of the Questions Involved":

> A. Whether the [Orphans'] Court erred in and abused its discretion in terminating [Mother's] parental rights where [Mother] has remediated the issues that led to the placement of the child[ren]?
>
> B. Whether the [Orphans'] Court erred as a matter of law in terminating [Mother's] parental rights based on the testimony which established that there are ways to ongoingly support Mother to the extent it is needed to ensure Mother continues to meet the special needs of her child[ren]?
>
> C. Whether the [Orphans'] Court erred as a matter of law in determining it would not be detrimental to sever the bond Mother has with the children in light of the fact that the minor child[ren] [have] only been in the current placement since October 21, 2019?

Mother's Brief at 4 (suggested answers omitted).

We review Mother's claims mindful of our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the [Orphans' Court] if they are supported by the record. If the factual findings are supported,

appellate courts review to determine if the [Orphans' Court] made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The [Orphans' Court's] decision, however, should not be reversed merely because the record would support a different result. [Our Supreme Court has] previously emphasized [the appellate courts'] deference to [Orphans' Courts] that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 620 Pa. 602, 71 A.3d 251, 267 (2013) (quotation marks, quotations, and citations omitted). "The [Orphans'] [C]ourt is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citations omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [subsection] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [subsection] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

In the case *sub judice*, the Orphans' Court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), as well as subsection (b), which provide as follows:

- 10 -

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\*\*\*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental,

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b) (bold in original).

Mother first contends the Orphans' Court erred in determining BCCYS met its burden of proof under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8). We have long held that, in order to affirm the termination of parental rights, we need only agree with the Orphans' Court as to any one subsection of 2511(a), as well as subsection 2511(b). **See In re B.L.W.**, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, with regard to subsection 2511(a), we conclude the Orphans' Court properly found that BCCYS met its burden of proof under subsection 2511(a)(2).

To satisfy the requirements of subsection (a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his or her physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. **See In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa.Super. 2003). The grounds for termination of parental

rights under subsection (a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. ***In re A.L.D.*** 797 A.2d 326, 337 (Pa.Super. 2002).

In the case *sub judice*, in terminating Mother's parental rights, the Orphans' Court relevantly indicated the following:

> In this case, BCCYS argue[d] that Mother…continue[d] to struggle with understanding the severe medical needs of [the] children. During her testimony at the termination hearing, Mother acknowledged missing two additional medical appointments prior to the hearing. (N.T. 11/4/19 at 24, 26). Mother has also failed to maintain employment—admitting at the hearing that she, once again, obtained a job but quit that job two months prior to the hearing without securing any additional employment. (N.T. 11/4/19 at 21). Mother stated that she quit her job because it was too difficult to comply with the requirements of BCCYS and work at the same time. (N.T. 11/4/19 at 22).
>
> Mother also testified that she has been receiving SSI for her entire life, yet she…has no idea why she is receiving these benefits. (N.T. 11/4/19 at 22, 28). Mother also completed a domestic violence evaluation and counseling. Despite completing this counseling, Mother has found herself in another relationship that was minimizing during treatment. It is concerning to [the Orphans'] Court that Mother stated on May 30, 2019[,] that the relationship was not serious but then showed up at the hearing on November 4, 2019[,] and exclaim[ed] that she was now eight (8) months pregnant with a child from a man with a violent criminal history. (N.T. 11/4/19 at 20).
>
> It was also determined by Valerie George, a caseworker and counselor to Mother, that Mother has failed to demonstrate the ability to care for [the] children on her own after all this time. (N.T. 11/4/19 at 44). Ms. George also testified that she had given Mother the opportunity to transport the children to their medical appointments but that resulted in some missed appointments and she, therefore, had to resume transportation for Mother. (N.T. 11/4/19 at 45). Mother also continued to demonstrate an inability to supervise the children without adult assistance. She was not

- 13 -

consistent with discipline and did not follow through. Mother was unable to remember information provided at meetings and medical appointments.

Mother completed a Mental Health evaluation by Dr. Small. However, BCCYS has not received any information that Mother has successfully completed any kind of mental health treatment. In fact, Mother has acknowledged that she has not received any treatment for her bipolar disorder and schizophrenia.

\*\*\*

Mother has been unable to unilaterally care for both of [the] children on a consistent basis while in the care and custody of BCCYS. The reports of Dr. Small and Dr. Fritts both establish the mutual concerns regarding [M]other's limitations as well as the children's excessive medical needs. (N.T. 11/4/19 at 50). Moreover, Mother's own mental health diagnosis and medical condition have seemingly prevented her from providing any meaningful long-term care for [the] children.

Counsel for Mother presented the testimony of Jessica Gonzalez, presumably to show the great extent of Mother's ability to eventually care for [the] children. However, Ms. Gonzalez admitted that[,] although Mother was showing improvement in certain areas, Ms. Gonzalez did not personally attend any of the medical appointments at CHOP and, importantly, Ms. Gonzalez could not opine that Mother was able to care for [the] children independently. (N.T. 11/4/19 at 63). In fact, there was absolutely no testimony that Mother would eventually be able to perform the actions necessary to assume parenting responsibilities. *See In re I.J.*, 972 A.2d 5 (Pa.Super. 2009) (stating that a child's needs for permanence and stability cannot be subordinated indefinitely to a parent's claims of progress and hope for the future).

Orphans' Court Opinion, filed 1/8/20, at 13-14 (footnote omitted).

We discern no abuse of discretion in the Orphans' Court's conclusion that the termination of Mother's parental rights was proper pursuant to subsection 2511(a)(2). Specifically, BCCYS proved by clear and convincing evidence that Mother has repeatedly refused to provide the children with the

- 14 -

essential parental care for their physical well-being and Mother cannot or will not remedy the situation. **See** 23 Pa.C.S.A. § 2511(a)(2).

Regarding Mother's contention termination is improper under subsection 2511(a)(2) since the testimony of Ms. Gonzalez established there are ways to support Mother to ensure she meets the special medical needs of the children, we find Mother is not entitled to relief.

In rejecting Mother's claim, the Orphans' Court indicated the following:

> Mother alleges [the Orphans'] Court could not terminate Mother's parental rights based on the testimony which established that there are ways to ongoingly support Mother to the extent it is needed to ensure Mother continues to meet the special needs of [the children]. Mother relies specifically on the testimony of Jessica Gonzalez[.] This argument is without merit as Ms. Gonzalez…could not opine that any of the services she mentioned were available to Mother or that they would alleviate the concerns of BCCYS. Her testimony in this regard was purely speculative at best as she uses the phrases "maybe" and "possibly." (N.T. 11/4/19 at 63). Such testimony is not persuasive to [the Orphans'] Court. Therefore, Mother's argument is wholly without merit.
>
> For all [of] the reasons stated above,…Mother is unable to remedy the causes of incapacity due to her repeated failures, [her] mental health concerns[,] and her own medical condition.

Orphans' Court Opinion, filed 1/8/20, at 15.

We discern no abuse of discretion. As indicated *supra*, "[t]he [Orphans'] [C]ourt is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re M.G.**, 855 A.2d at 73-74 (citation omitted).

Mother's remaining claim relates to the Orphans' Court's determination that termination of Mother's parental rights would best serve the children's best interests under subsection 2511(b). In this regard, Mother contends the evidence supports the conclusion that Mother has a bond with the children and that severance of this bond would be detrimental to the children.

> [Subsection] 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, [subsection] 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the [Orphans' Court] can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court [has] stated that the [Orphans' Court] should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quotation marks, quotations, and citations omitted).

In the case *sub judice*, the Orphans' Court found that termination of Mother's parental rights best met the children's needs and welfare under subsection 2511(b) and reasoned as follows:

> BCCYS has had custody of the minor children since March of 2018. The conditions which led to the children's placement continue to exist, and Mother has not shown an ability to remedy

the conditions within a reasonable period of time. Mother has failed to grasp the serious nature of [the] children's medical conditions, continues to miss appointments, and is limited in her own abilities due to her own mental and physical health conditions. While [the Orphans'] Court does not question that Mother loves [the] children, Mother has not shown an ability to cure the issues that led to her incapacity in raising [the] children safely. Therefore, the [Orphans'] Court must…determine whether the termination of parental rights would best serve the needs and welfare of the child[ren].

Initially, [the Orphans'] Court credits the testimony of BCCYS caseworker Rebecca Mill who credibly testified that Mother continues to be prompted about topics that need to be covered, such as nutrition, eating, and following through with discipline. (N.T. 11/4/19 at 48-49). Certainly, these are issues directly related to the needs and welfare of the children. Moreover, [the Orphans'] Court finds that Ms. Mill credibly testified that the agency sees no detriment to terminating parental rights in this case. (N.T. 11/4/19 at 52).

The inquiry does not rest here, however, as the [appellate courts have] stated that "[i]n considering how termination affects the children's needs and welfare, a court must consider the role of the parental bond in the children's lives." ***In re P.A.B.***, 570 A.2d 522, 528 (Pa.Super. 1990).

Instantly, [the Orphans'] Court needs to look no further than the report of Dr. Laura Fritts who was asked specifically to answer the question of the parental bond between Mother and [the] two children. As stated above, Dr. Fritts performed a bonding evaluation on July 25, 2019. Dr. Fritts concluded that the children clearly love their mother and are well bonded to her. However, Dr. Fritts noted that the loving bond shown by the children was "more as a friend or playmate" rather than as a mother. Dr. Fritts also stated that whereas the children were "animated, bright, alert, playful and engaged," Mother was noted to be "more remote." Overall, Dr. Fritts concluded that Mother did not appear as attached and bonded to [the] children as they were to her—which is not as "one would hope to see."

This question of "bond" relates to Mother's third and final allegation…; namely[,] that [the Orphans'] Court erred in determining it would not be detrimental to sever the bond Mother has with the children in light of the fact that the minor child[ren] have only been in the current placement since October 21, 2019.

Initially, the report of Mother's own requested expert, Dr. Fritts, exposes the nature of the "friendly" bond that Mother shares with [the] children. To that extent, [Mother's] argument is flawed.

The second part of Mother's argument[,] however[,] implicates the nature of the relationship and the current bond that exists between the children and their current resource, Maritza Colon. Ms. Colon presented as a resource on May 2, 2019[,] and was thus aware to Mother for nearly six (6) months prior to the termination hearing. Ms. Colon lives in Maryland and was referred…for a home study. Mother knows Ms. Colon and has never objected to her as a resource. Mother testified that Ms. Colon is the mother of her brother's wife, who also live in Maryland. (N.T. 11/4/19 at 36-37).

The current BCCYS caseworker, Rebecca Mill, credibly testified that both children are doing "very well" in this environment. (N.T. 11/4/19 at 50). Ms. Mill indicated that Ms. Colon keeps her updated on the wellbeing of both children and that "they both refer to it as their home already." She further noted that they are having a great time with their cousins, who live in the area. The caseworker had an opportunity to observe the children during a recent visit and noted that "they are bonded already." (N.T. 11/4/19 at 51). This bond appeared to be buttressed by Mother's own witness, Jessica Gonzalez, who saw the children in Ms. Colon's custody and noted that "they appeared happy" and that they gave Ms. Colon a hug and a kiss. (N.T. 11/4/19 at 62).

Importantly, Ms. Colon is uniquely familiar with the NF1 disease because "one of her grandchildren also has appointments at CHOP for a similar or the same condition." (N.T. 11/4/19 at 51). As such, [the Orphans'] Court is satisfied, not only are the children bonded with Ms. Colon, but there is also a family connection with their uncle and two cousins[,] and their medical condition of NF1 is something that is familiar to Ms. Colon and her family. It is also worth noting that Ms. Colon appears highly receptive to fostering an ongoing relationship with Mother. As Ms. Mill testified:

> They actually requested that mom move to Maryland and be part of their lives there and help her [get] set up with an apartment, a job, and, you know, be involved in holidays, birthdays…[w]hen they start getting involved in sports, plays, whatever the children are involved in.

(N.T. 11/4/19 at 52).

> Based on all [of] this information, [the Orphans']
> Court…[concludes] that the testimony credibly establishes a
> strong bond with a resource who would continue to act with the
> best interests of both children in mind.

> ***

> After reviewing the testimony and considering the exhibits,
> [the Orphans'] Court finds that a natural parental bond is lacking,
> as per the report of Mother's own witness, Dr. Fritts.   The
> [Orphans'] Court rests on [the] detailed "bond" analysis [set forth]
> above.   Moreover, it is abundantly clear to [the Orphans'] Court
> that the termination of Mother's rights will serve the best interests
> and welfare of both minor children.  Mother has shown her inability
> to understand and appreciate the serious nature of [the] children's
> medical conditions and has continued to miss necessary medical
> appointments.    She has consistently lacked the insight to
> appreciate her own limitations and has miss[ed] her own medical
> appointments while, at the same time, engaged in relationships
> with men of questionable moral character—including her most
> recent pregnancy with a man with a violent criminal history.

> It is also clear that [the] children are in a safe and stable
> environment and that termination will not be detrimental to either
> children.  In fact, it seems quite apparent that the children are
> already well bonded to their resources in Maryland and that they
> have the benefit of being around family members, obtaining
> appropriate medical care[,] and have the consent of the resource
> to maintain a relationship with Mother, should she so choose.  For
> these reasons, [the Orphans'] Court [concludes] that Mother's
> issue[] [does] not contain any merit and that the needs of both
> minor children would best be served by the involuntary
> termination of Mother's parental rights[.]

Orphans' Court Opinion, filed 1/8/20, at 16-20 (citations to exhibits omitted).

We discern no abuse of discretion in the Orphans' Court's reasoning.

The credited testimony supports the Orphans' Court's determination that it

would best serve the needs and welfare of the children to involuntarily

terminate Mother's parental rights pursuant to subsection 2511(b). ***See In re T.S.M.***, ***supra***.

For all of the aforementioned reasons, we affirm the Orphans' Court's Decrees, which involuntarily terminated Mother's parental rights to H.D.K. and H.A.K.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 04/17/2020